[Crim. No. 1534.   Second Appellate District, Division Two.—November 2, 1927.]

THE PEOPLE, Respondent, v. SARAH KERRICK et al., Appellants.

Welborn Mayock, Clarence M. Booth, Stanley Visel, Ernest K. Maine and F. M. Andreani for Appellants.

U. S. Webb, Attorney-General, and Frank Richards, Deputy Attorney-General, for Respondent.

THOMPSON, J.—The defendants and appellants were charged by indictment with the crime of murder. They were tried jointly and verdicts of manslaughter were returned against each of them. Motions for a new trial were filed on behalf of Sarah Kerrick and also on behalf of Joe Hunt and Iris Burns and lastly on behalf of Henry Isabel and Anita Davis. Each of these motions was denied and the defendants prosecute their appeals from the orders mentioned and from the judgments upon the verdicts.

The attorney-general, with commendable sincerity, evidencing an appreciation on the part of that office that public officers charged with the administration of the law are or should be interested solely in promoting the cause of justice, closes his brief for the people with this language: "We have discussed all points raised by appellants; and that due to the errors which we believe to exist in the record we do not ask for an affirmance."

With this confession of error before us it will be sufficient if we set forth only enough of the facts to make clear the errors complained of and statements of the law applicable thereto to clarify the situation on retrial. On the evening of June 26, 1927, the deceased, Tom Kerrick, and his wife, appellant Sarah Kerrick, and Joe Hunt, together with Iris Burns, who at the suggestion of deceased had been invited as a companion for Hunt, and after the purchase of a quantity of intoxicating liquors, drove to Lankershim, where they persuaded Henry Isabel and his wife to join the party. During the succeeding drive Joe Hunt's revolver dropped to the floor of the car and was picked up by the appellant Sarah Kerrick. She says that when they arrived home she took the gun out of her handbag and put it upon the mantel and does not remember of picking it up again, although she does remember of having it when her husband chased her into the kitchen just before he was killed, and that she "must have picked it up on the mantel as" she "passed." Before their arrival home most of the party were well intoxicated—and the drinking continued. Joe Hunt went to sleep on the kitchen floor and Iris Burns became nauseated. She finally lay down on the couch in the living-room. Sarah Kerrick and Anita Davis went to the

home of one of the neighbors in an unsuccessful attempt to recruit new members of the party, and as they returned found Henry Isabel on the couch with Iris Burns in an unduly intimate position. An altercation ensued concerning the details of which the witnesses differ. According to Sarah Kerrick it was more or less of a general melee, during which Kerrick was shot. She says: ''During the time we were struggling over this gun was when the shot was fired.'' Anita Davis, after testifying to the quarrel, says that she thought the fight was over, and that all of them except Tom Kerrick went into the kitchen to have some coffee; that when deceased came in he was offered coffee by Mrs. Kerrick, which he refused, but he did say that he would drink with Iris Burns; that Sarah Kerrick put her hand down to her side and ''she pulled her hand up on her lap. I saw the gun and I grabbed her arm, hooking my arm through hers and jerked her back, at the same time the gun went off. I can't say if the gun had gone off before that, but I know it went off then. She just went limp. She just gave in entirely. Then I glanced up right quick and Tom wheeled around with his back to us, he had been facing us. The blood was running down the side of his mouth and he staggered into the living-room.'' This last testimony is the only testimony which might be construed as showing directly that the appellant Sarah Kerrick did the shooting, although it is open to the construction that the gun was discharged by reason of the tussle between the appellants Sarah Kerrick and Anita Davis. This much is clear, that the party was hilarious and that a quarrel took place, during which Tom Kerrick was killed.

The appellant Sarah Kerrick made a motion for an advisory verdict of not guilty at the conclusion of the prosecution's opening statement, on the ground that proof of all the facts mentioned by the district attorney would not be sufficient to convict. Suffice it to say that there is no provision in our law for such a motion at that juncture. Section 1118 of the Penal Code provides that a motion of like character may be granted ''after the evidence of either side is closed.'' But we know of nothing which would justify the court in granting such a motion prior to the introduction of the state's evidence.

■ The next assignment by the appellant Sarah Kerrick is untenable. She complains of the refusal of the court to give the following instruction: "The jury are instructed that if the shooting in this case was accidental it becomes, of course, your duty to render a verdict of not guilty as to all defendants, and in considering whether the shooting was accidental or otherwise, it is your duty to resolve all doubts upon that question in favor of the defendants and against the prosecution, keeping in mind at all times that the defendants and each of them are presumed to be innocent of the crime charged in the indictment and all other crimes and offenses." This instruction would authorize the jury to acquit if the homicide were accidental, regardless of any other circumstances, but an accidental shooting is not always excusable or justifiable. (Secs. 195–197, Pen. Code; *People* v. *Hubbard*, 64 Cal. App. 27 [220 Pac. 315], and cases there cited.)

The court instructed the jury as follows:

(15) "You are instructed that a homicide committed by accident and misfortune, even in the heat of passion, or upon sudden and sufficient provocation, or upon sudden combat, is not excusable when the person or persons, committing the homicide was, or were, at the time violating some law, or using any dangerous weapons in the commission of the homicide. And if you should find from the evidence in this case beyond a reasonable doubt that Tom Kerrick was killed by a gunshot wound fired by some person in the heat of passion, or upon some sudden and sufficient provocation, or in a sudden combat, it is not an excusable homicide and it would be your duty to return a verdict of guilty, if at the time you were satisfied beyond a reasonable doubt that the persons committing the homicide were violating some law and that said homicide was not in the necessary self-defense of habitation, property or person."

(16) "You are instructed that whenever two or more persons assemble together to do an unlawful act and separate without doing or advancing toward it, or do a lawful act in a violent, boisterous and tumultuous manner, such assembly is an unlawful assembly, and if the jury are satisfied to a moral certainty and beyond a reasonable doubt that the defendants were assembled together in the home of

Tom Kerrick for the purpose of a party and by the use of intoxicating liquors or otherwise, said party was carried on in a violent, boisterous and tumultuous manner and that some one member of the party shot and killed Tom Kerrick while said party was so conducted in such violent, boisterous and tumultuous manner, then you should return a verdict of guilty against all the defendants so engaged in such violent, boisterous and tumultuous manner in conducting such party.''

(17) ''You are instructed that when two or more persons assembled and acting together, make any attempt or advance toward the commission of an act which would be a riot if actually committed, such assembly is a rout. And you are further instructed that any use of force or violence, disturbing the public peace or any threat to use such force or violence if accompanied by immediate power of execution by two or more persons so assembled and so acting together and without authority of law is a riot, and if you are satisfied to a moral certainty and beyond a reasonable doubt that at the time charged in this Indictment the defendants were engaged in disturbing the public peace and that Tom Kerrick was killed accidentally by one of said defendants without malice aforethought, you should return a verdict of manslaughter as charged in this Indictment against all the defendants so acting during the time of such riot if you find there was a riot.''

(20) ''You are instructed that a person must be presumed to do that which he voluntarily and wilfully does in fact do, and must also be presumed to intend all the natural, probable and usual consequences of his own voluntary acts. Therefore you are instructed that whenever two or more persons assemble together to do an unlawful act and separate without doing or advancing toward it, or do a lawful act in a violent, boisterous and tumultuous manner, such assembly is an unlawful assembly. And if the jury are satisfied to a moral certainty and beyond a reasonable doubt that the defendants, or some of them, were assembled together in the home of Tom Kerrick for the purpose of doing an unlawful act or for doing a lawful act in a violent, boisterous and tumultuous manner and that some one member of the party shot and killed Tom Kerrick while the

members were so assembled, and not in the necessary self-defense of habitation, property or person, then you should return a verdict of guilty against all the defendants so engaged. If you find that said shot was fired accidentally, under such circumstances as described above, but without malice, your verdict should be guilty of manslaughter, and if you are satisfied that said shot was fired intentionally, then your verdict will be that of murder of the first or second degree."

All of the appellants attack these instructions on two grounds: First, that they ignore the element of causal relation between the doing of the unlawful act and the homicide, and, second, that the instructions would make all guilty if they were participating in an unlawful act, regardless of their knowledge or participation in the design of the actor. These contentions must be upheld. By the instruction the jury were told that all the defendants should be found guilty if they were engaged in doing some unlawful act, and during the time they were so engaged Tom Kerrick was shot and killed by one of them, regardless of whether the homicide was so related to the unlawful act in which they were engaged that it may be said that death was a natural and probable consequence of the act. Injustice is not law and yet a moment's reflection demonstrates that such a rule would operate most illogically and unjustly. We cannot ignore the element of causation in the unlawful act necessary to connect it with the offense. In our ordinary phraseology we refer to the result of this element by saying it must be the probable consequence naturally flowing from the commission of the unlawful act. In 13 R. C. L., page 845, we read the rule as follows: "It may be stated generally that a homicide is committed in the perpetration of another crime, when the accused, intending to commit some crime other than homicide, is engaged in the performance of any one of the acts which such intent requires for its full execution, and while so engaged, and within the *res gestae* of the intended crime, and in consequence thereof, the killing results. It must appear that there was such actual legal relation between the killing and the crime committed or attempted, that the killing can be said to have occurred as a part of the

perpetration of the crime, or in furtherance of an attempt or purpose to commit it.'' (See *Jackson* v. *State,* 101 Ohio St. 152 [127 N. E. 870]; *Commonwealth* v. *Couch* (Ky.), 106 S. W. 830.)

█ The second attack of appellants must be upheld. Under the instructions as given, if the defendants had assembled together for the purpose of engaging in an unlawful act which would not in its probable consequence tend to destroy life, and one member of the party departed from the original purpose of the gathering and shot and took the life of Kerrick, all might be convicted, regardless of their participation in the design and intent of the one who committed the offense. In 29 C. J. 1149, the rule is stated, in discussing the offense of manslaughter where one unintentionally kills another in doing an unlawful act, as follows: ''But the death must be due to the unlawful act of defendant and not to the intervening act of negligence of a third person; or to an independent intervening cause in which defendant did not participate and which he could not foresee, and the death must have been the natural and probable consequence of the unlawful act, and the act the proximate cause.'' Again, at page 1070 of the same volume, it is said: ''In order to render one responsible as a principal in the second degree or as an accessory before the fact in the commission of the homicide, it is essential that he share in the criminal intent of the direct actor. Thus, although one may have had some difficulty or altercation with the deceased, he is not responsible for a homicide committed at or about the same time by a third person, acting independently, if he did not share in the design of such third person. The fact that the altercation brought on the fatal encounter is immaterial. The same is true of the fact that one was the aggressor in the difficulty, or that the third person interfered to aid him. It is not enough that the acts of one tended to aid or encourage the principal in the first degree, they must have been done for that purpose. . . . If two or more are acting independently, and the actual perpetrator of the homicide cannot be identified, all must be acquitted, although it is certain that one of them was guilty. . . . While it is essential in order to render one guilty as a principal in the second degree or as

an accessory before the fact that he share in the criminal intent of the principal in the first degree, it is not necessary that his participation in the homicide should have been by preconcert with the actual perpetrator, nor need he have originated the criminal design. A common design need not have existed for any particular length of time before the commission of the homicide. It is sufficient if there was a community of purpose between accused and the direct actor at the time the homicide was committed.'' In the case of *People* v. *Kauffman*, 152 Cal. 331 [92 Pac. 861], the court quotes with approval a statement found in 8 Cyc. 641, as follows: '' 'Nevertheless the act must be the ordinary and probable effect of the wrongful act specifically agreed on, so that the connection between them may be reasonably apparent, and not a fresh and independent product of the mind of one of the confederates outside of, or foreign to, the common design. Even if the common design is unlawful, and if one member of the party departs from the original design as agreed upon by all of the members, and does an act which was not only not contemplated by those who entered into the common purpose, but was not in furtherance thereof, and not the natural or legitimate consequence of anything connected therewith, the person guilty of such act, if it was itself unlawful, would alone be responsible therefor.' '' And to the same effect in *Butler* v. *People*, 125 Ill. 641 [8 Am. St. Rep. 423, 1 L. R. A. 211, 18 N. E. 338], it is said: ''No person can be held responsible for a homicide unless the act was either actually or constructively committed by him. And in order to be his act it must be committed by his hand, or by someone acting in concert with him, or in furtherance of a common design or purpose. Where the criminal liability arises from the act of another, it must appear that the act was done in furtherance of the common design, or in prosecution of the common purpose, for which the parties were assembled or combined together, otherwise a person might be convicted of a crime to the commission of which he never assisted, which could not be done upon any principle of justice.'' There can be no doubt but that such is the rule of law applicable to the situation here.

The appellants also assail two of the instructions heretofore quoted (No. 16 and No. 20) on the ground that

they do not correctly define an unlawful assembly. It should be noted first that both of the instructions use the words of section 407 of the Penal Code. The appellant Sarah Kerrick contends that if when two or more persons assemble there is no intent to do a lawful act in an unlawful manner, that is to say, in a violent, boisterous, and tumultuous manner, that there is no offense. We cannot agree with this assertion. The section of the code to which we have referred seems merely to be a reaffirmation of the common law. In American and English Encyclopedia of Law (second edition), page 344, we read that: "It is not always necessary that a specific intent of any sort should exist in the minds of the persons assembled in order to constitute the offense, because it is well settled that an assembly of persons attended by circumstances reasonably calculated to excite alarm is an unlawful assembly, regardless of the matter of intent." The text is supported by authorities from which we select the following: "There seem to be two modes in which an assembly of persons may become unlawful, so as to be a subject of indictment; one, by the purpose for which it meets, and the other, without regard to its purpose, by the numbers and demeanor of those present at it." (*Slater* v. *Wood*, 9 Bosw. (N. Y.) 15.) ■ And in another standard encyclopedia we read that the purpose or intent "may be formed either before or at the time of assembling, or it may be formed with the agreement of mutual assistance after the assembling." This latter manner of expressing it would seem to clarify the situation. It is immaterial at what time the intent to do the lawful act in an unlawful manner is formed—whether prior to or during the assembly. As stated in Wharton's Criminal Law, section 1856, "a lawful assembly becomes unlawful whenever the members agree to resort to violent and tumultuous measures to achieve even a lawful end."

■ The other appellants attack these two instructions upon the ground that they do not define unlawful assembly in such a manner as to give the jury a clear concept of the nature of the offense of unlawful assembly, and with this criticism we are bound to agree. Not every meeting where violent, boisterous, and tumultuous conduct occurs may be denominated an unlawful assembly, even though that be the wording of the statute. It is particularly dangerous

in a country where meetings are constantly held for every conceivable purpose, many of them accompanied with much noise and excitement, to lay down such a doctrine. At this time of the year in our country in almost every hamlet, and certainly in every city of any size, contests between the youth of schools and colleges are being staged which could not be characterized as anything other than violent, boisterous, and tumultuous. Yet the communities are not alarmed and the public peace is not endangered. No one would for a moment characterize high school or college football games as unlawful assemblies. ▮ The statute was intended to prevent "any tumultuous disturbance of the public peace by" two or more persons "having no avowed, ostensible, legal or constitutional object, assembled under such circumstances, and deporting themselves as to produce danger to the public peace and tranquillity, and which excites terror, alarm and consternation in the neighborhood." (*In re Charge to Grand Jury,* 4 Pa. L. J. 29.) The jury should consider, as we read again in Wharton's Criminal Law, section 1851, "In determining the question of terror, . . . whether rational and firm men, in charge of families, would have, under the circumstances, cause for anxiety; and in testing this it is necessary to take into account the hour at which the parties meet, the language used by them, and the acts done."

We have examined the other specifications of error and find nothing which in the event of a retrial requires comment.

The judgments and orders are reversed.

Works, P. J., and Craig, J., concurred.