[Crim. No. 3558. Third Dist. Aug. 25, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. CHARLES MERLE BUTTS et al., Defendants and Appellants.

L. Miles Snyder, under appointment by the District Court of Appeal, and Andrew J. Hollis for Defendants and Appellants.

Stanley Mosk and Thomas C. Lynch, Attorneys General, Doris Maier, Assistant Attorney General, Raymond M. Momboisse and Daniel J. Kremer, Deputy Attorneys General, for Plaintiff and Respondent.

FRIEDMAN, J.—This appeal involves two defendants, Otwell and Butts. On March 12, 1965, we filed our original decision in the case. On April 6, 1965, as the result of information not appearing in the record but presented to us by the Attorney General's petition for rehearing, we directed a minor modification in the order of reversal as to defendant Butts. On June 3, 1965, the Supreme Court granted a hearing and transferred the cause to this court for further consideration in the light of *Griffin* v. *California*, 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106], decided by the United States Supreme Court on April 28, 1965.

At the trial of these two defendants Butts took the stand to testify in his own defense but Otwell did not. The trial took place in December 1963, more than a year before the *Griffin* decision. As permitted by the then standard Cali-

fornia rule, the prosecutor commented and the trial court instructed the jury on the subject of Otwell's failure to explain or deny the prosecution evidence. (See Cal. Const., art. I, § 13; Pen. Code, § 1323.) The *Griffin* case holds that such comment and instruction violate the Fifth and Fourteenth Amendments of the federal Constitution. A sequel to the *Griffin* case is the California Supreme Court's decision of June 3, 1965, in *People* v. *Bostick,* 62 Cal.2d 820 [44 Cal. Rptr. 649, 402 P.2d 529], holding that comment in violation of the *Griffin* rule is not reversible error per se; rather, the rule of article VI, section 4½, of the California Constitution applies, permitting reversal only if the error resulted in a miscarriage of justice.

While error may be waived by a failure to object, Otwell's trial counsel may not be held to assertion in the trial court of the then unrevealed *Griffin* doctrine. (See *People* v. *Hillery,* 62 Cal.2d 692, 711-712 [44 Cal.Rptr. 30, 401 P.2d 382].) The absence of objection during the trial does not preclude Otwell from asserting the new *Griffin* rule on appeal. Thus it is now our obligation to review the entire record to ascertain if there is a reasonable probability that the jury would have reached a result more favorable to Otwell had there been no comment and instruction on his failure to testify. (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)

As to the remainder of the case, we adhere to our original views and simply restate our original opinion, with minor modifications consistent with our order of April 6, 1965, relative to defendant Butts.

Otwell and Butts were jointly indicted upon a count of conspiracy to commit assault, a count charging murder of Lonnie Barnard, a count of assault upon Joseph Abreu with intent to commit murder, and a count of assault with intent to commit murder upon David Brewton. A jury found Otwell guilty on all four counts, fixing the homicide as second degree murder. The jury returned verdicts finding Butts guilty of conspiracy to commit assault, involuntary manslaughter as an included lesser offense, and simple assault upon Abreu and Brewton as included lesser offenses. New trial motions were denied and judgments pronounced. Both defendants appeal.

Near 2 o'clock in the morning, Butts, 27, and Otwell, 22, were driving through Oroville on their way to get some breakfast. Otwell was driving Butts' aging Nash because

Butts was intoxicated. Otwell pulled out suddenly after stopping at an arterial sign, spraying gravel on a new Chevrolet in which Jack Herd, 19, Larry Herd, 17, and Lonnie Barnard, 20, were riding. When Otwell turned into the lot of a cafe called Miner's Inn, the Chevrolet pulled alongside and Lonnie Barnard asked defendants if they wanted to ''race for five.'' Otwell said that he did not want to race.

At that point Butts left his car and walked around to the right side of the Chevrolet where Lonnie Barnard was sitting. Butts told Lonnie that he wouldn't race him for five but would fight him for ten. When Lonnie declined to fight, Butts reached in through the car window and hit him in the face. Butts testified that he couldn't remember hitting anyone, but that while he was between the cars somebody grabbed his arm and he pulled it away. After this incident the boys drove away and defendants went into the Miner's Inn.

The Herd brothers and Lonnie then drove to the home of Tom Abreu, 17, and picked him up, telling him only that they were going back to the Miner's Inn. On the way back Lonnie told Abreu that he was going to fight ''some big guys'' and that he wanted Abreu, a good fighter, to come along to keep the fight fair. Gerald David Brewton and Tom Abreu's younger brother, Joey, sensed that a fight was brewing and followed in Brewton's car to watch.

Meanwhile Butts and Otwell were having coffee at the Miner's Inn and at least one of them had ordered food. Butts testified that he felt like vomiting and had gone outside to find the men's room when the boys began calling him names. Other testimony was that the boys went to the side door of the cafe and saw both defendants seated at the counter, that they gestured to defendants indicating that defendants should come out and fight and that one of them answered ''. . . after we get done eating, punk.'' In any event, neither defendant waited to eat. Butts went outside and Otwell either accompanied him or followed about two minutes later. The boys testified that Butts and Otwell walked side by side and followed Lonnie Barnard and Tom Abreu to the lot behind the cafe. The boys said that Butts attacked Abreu; Butts claimed that he was attacked by several boys. Two separate skirmishes developed, Butts fighting Tom Abreu and Lonnie Barnard fighting Otwell some 45 to 100 feet away. According to the boys' testimony, the Herd brothers and Joey Abreu remained in one of the cars, while

Gerald Brewton was near the side of the cafe but not engaged in the fight.

Butts was too intoxicated to land a punch and was struck repeatedly by Tom Abreu. (Later evidence established that Butts' blood-alcohol level was .206 per cent, indicating according to a medical witness that he was "moderately drunk.") Then Jack Herd came from the car and beat Butts while Abreu held him in a "full nelson." In the fight between Lonnie Barnard and Otwell, Lonnie staggered and doubled up after being struck several times by Otwell. When Brewton and Joey Abreu went to help him, each received a blow from Otwell. Brewton said that at first it seemed as though Otwell were hitting very hard and then he realized that he had been cut and was bleeding. Larry Herd ran to Lonnie Barnard and began to help him from the scene. Barnard told him that Otwell had a knife and to warn the others. About this time Otwell said "You damn right I've got a knife, and I'm going to use it."

Otwell then ran toward the Butts fight. On hearing the warning of a knife, Tom Abreu and Jack Herd left Butts and ran away, circling around to help Larry Herd with Barnard, who had collapsed. Butts and Otwell then advanced on the boys. Unable to carry Barnard any further, Larry Herd and Tom Abreu laid him on the ground and began to throw rocks at the oncoming defendants. The two groups exchanged rocks with Jack Herd joining in. Suddenly Butts and Otwell ran to their car and drove away.

Lonnie Barnard was cut in five places and died of a stab wound which penetrated his heart. Brewton received a cut on the right shoulder and a second cut, approximately 3½ inches long, extending from his left armpit toward his neck. Joey Abreu received a 3-inch cut on the left side of his chest and a small cut near the right collarbone. Otwell's trousers were bloodstained when defendants were arrested approximately an hour after the fight. When defendants' car was found, the front seat and the steering wheel were stained with blood. Otwell's weapon was never found. One witness testified to a metallic gleam during the fight. A pathologist testified that Barnard's cuts were probably inflicted by a small knife.

### Appeal of Otwell

Before proceeding to more substantial issues, we dispose of two minor assignments of error forming the only grounds of attack on Otwell's second degree murder conviction.

Otwell's brother James was called as a character witness and testified that his brother's reputation for peace and quiet was good. In the course of his cross-examination by the deputy district attorney the following colloquy occurred:

"Q. Was your, was your brother arrested and convicted of burglary during that year in Louisiana?

"A. I don't remember what year.

"Q. Did he do two years in the penitentiary there about that time?"

Otwell's trial counsel promptly objected and assigned the question as misconduct. Indeed it was improper. █ Although, as a means of testing the character witness' knowledge of reputation, the district attorney may ask the witness whether he has *heard* of specific acts of misconduct, he may not ask the witness whether he *knows* of specific acts of misconduct. (*People* v. *Marsh*, 58 Cal.2d 732, 745-746 [26 Cal. Rptr. 300, 376 P.2d 300].) █ The trial judge immediately sustained the defense objection, admonished the jury and instructed the prosecutor to defer that line of examination until court and counsel could confer. Later, outside the jury's presence, the trial judge instructed counsel on the appropriate method of cross-examination. From that point on the prosecution adhered to the approved mode of cross-examination.

The prosecution error appears to have been inadvertent. Whatever slight harm it caused was promptly obviated by the trial court. Viewed in relation to evidence overwhelmingly establishing Otwell's guilt of second degree murder, the court's admonition to the jury was adequate to cure the error. If misconduct at all, the prosecution questioning did not result in a miscarriage of justice. (Cal. Const., art. VI, § 4½.)

█ A second claim of error is postulated on the denial of Otwell's new trial motion based upon newly discovered evidence. In support of the motion Otwell's trial counsel submitted the affidavit of one Hamby, who averred that at approximately 2 a.m. on the morning of the fight Lonnie Barnard came to his home and said: "We've got some trouble going at Miner's Inn. Would you come and help us?" On appeal it is argued that Hamby's newly discovered testimony would assist Otwell's claim of self-defense by making it apparent that Barnard was collecting other boys in order to mount an overwhelming attack on defendants rather than

getting just enough help to assure a fair fight. In actuality, Hamby's statement adds little to the trial testimony, for the other boys had testified to Barnard's pleas for reinforcements. ▮ A trial court has broad discretion in passing on a new trial motion based upon newly discovered evidence. (*People* v. *Greenwood*, 47 Cal.2d 819, 821 [306 P.2d 427].) ▮ The proffered evidence was merely cumulative and fell far short of the requirement that it possess enough strength to indicate the probability of a different result on retrial. (Witkin, Cal. Criminal Procedure (1963) § 561, p. 570.) There was no abuse of discretion.

Otwell contends that the verdicts finding him guilty of assault with intent to commit murder are inconsistent with the second degree murder verdict. Conviction of second degree murder requires no proof of premeditation or even of actual intent to take life; rather, the malice (intent) necessary to constitute second degree murder may be implied from commission of an unlawful act without sufficient provocation "or when the circumstances attending the killing show an abandoned and malignant heart." (Pen. Code, § 188; 1 Witkin, Cal. Crimes (1963) §§ 298-300, pp. 273-275; 25 Cal. Jur.2d, Homicide, §§ 109, 110, pp. 620-622.) ▮ The rule applicable to a killing resulting from assault with a deadly weapon is: " 'When it is proved that defendant assaulted decedent with a dangerous weapon in a manner endangering life and resulting in death and the jury concludes that the evidence did not create in their minds a reasonable doubt whether defendant's act may have been justified or its criminal character mitigated by the influence of passion (e.g., of terror, *People* v. *Logan*, 175 Cal. 45, 48, 49 [164 P. 1121]) then no further proof of malice or of intent to kill is required to support a verdict of guilty of second degree murder. Of that crime an actual intent to kill is not a necessary component and malice is implied from such assault in the absence of justifying or mitigating circumstances.' " (*Jackson* v. *Superior Court*, 62 Cal.2d 521, 526 [42 Cal.Rptr. 838, 399 P.2d 374], quoting from *People* v. *Torres*, 94 Cal.App.2d 146, 149-150 [210 P.2d 324].)

On the other hand, a number of the California authorities directly or indirectly hold that conviction of assault with intent to commit murder requires proof of specific intent to kill. (*People* v. *Mize*, 80 Cal. 41, 43 [22 P. 80]; *People* v. *Pineda*, 41 Cal.App.2d 100, 104 [106 P.2d 25]; *People* v. *Weston*, 32 Cal.App. 571, 578 [163 P. 691]; *People* v. *Ka-*

*foury,* 16 Cal.App. 718, 720 [117 P. 938]; 1 Witkin, Cal. Crimes (1963) § 261, p. 246; cf. *People v. Mendenhall,* 135 Cal. 344 [67 P. 325].) In finding him guilty of second degree murder, Otwell argues, the jury found that the slaying of Barnard was committed without premeditation, a determination at odds with the finding that he had a specific intent to take the life of Brewton and Joe Abreu.

 Second degree murder includes not only those killings where intent is implied, but also those where a specific intent to kill is present, although in the latter cases there is absent the span of reflection necessary to constitute premeditated murder. (See *People v. Craig,* 49 Cal.2d 313, 318-319 [316 P.2d 947]; *People v. Bender,* 27 Cal.2d 164, 179 [163 P.2d 8]; *People v. Thomas,* 25 Cal.2d 880, 900 [156 P.2d 7].) Thus the finding that Otwell had an intent to take the lives of Brewton and Joe Abreu is not in conflict with the second degree murder conviction. The verdicts are not inconsistent.[1]

The argument comes close to an assertion that there was inadequate evidence to support jury findings that Otwell assaulted Joe Abreu and Gerald David Brewton with a specific intent to take life, and we shall so regard it. In considering this phase of the case, we look only for substantial evidence to support the jury's finding of guilt. On appeal we assume in favor of the verdict the existence of every fact which the jury could reasonably have inferred from the evidence and then determine whether such facts are sufficient to support the verdict. (*People v. Daugherty,* 40 Cal.2d 876, 885-886 [256 P.2d 911].)

In his fight with the unarmed Lonnie Barnard, Otwell had delivered five knife cuts or thrusts, including several in the

---

[1]The Attorney General has called our attention to *People v. Bernard,* 28 Cal.2d 207, 214 [169 P.2d 636], stating that Penal Code section 217, denouncing assault with intent to commit murder, makes no distinction between murder in the first and second degrees. (See also *People v. Mason,* 183 Cal.App.2d 168, 175 [6 Cal.Rptr. 649].) The statement is open to the inference that assault with intent to commit murder may rest upon proof of intent to commit any of the acts within the scope of the second degree murder definition, including a nondeliberate killing. So interpreted, the *Bernard* statement is seemingly inconsistent with the decisions cited *supra,* requiring specific intent to take life as a component of assault with intent to commit murder. In *People v. Mendenhall, supra,* 135 Cal. at p. 347, the leading (albeit minority) opinion does espouse the view that a section 217 conviction may rest upon proof of implied malice, that is, implied rather than actual intent to kill. For present purposes, we have assumed that *People v. Bernard* does not qualify the rule requiring specific intent to take life as a condition of assault with intent to commit murder.

left chest, one of which penetrated the heart. On seeing Barnard doubled up, Gerald Brewton ran to his rescue, swung at Otwell and received two knife wounds. One was a slash in the left chest. Brewton's wounds required two months of hospitalization. Similarly Joe Abreu received two wounds, one a horizontal cut on the left chest requiring 20 stitches and a week of hospitalization. Joe Abreu testified that he saw a silvery, shining object protruding from Otwell's hand. When the warning of the use of a knife went up, Otwell shouted, "You damn right I've got a knife, and I'm going to use it."

In determining whether these assaults were made with intent to take life, the jury could consider the character of the weapon used, the manner in which it was used and the purpose to be accomplished. (*People* v. *Malki*, 181 Cal. App.2d 118, 122 [5 Cal.Rptr. 207]; *People* v. *Martinez*, 17 Cal.App. 579, 582 [120 P. 786].) However circumstantial the evidence of intent, it was for the jury to draw from it the hypothesis of innocence or guilt. (*People* v. *Daugherty, supra,* 40 Cal.2d at p. 886.) Otwell's use of a knife in a fight with unarmed youths, the seriousness of the wounds he inflicted and their location in relation to the heart, provided the jury with facts from which an intent to take life could reasonably be inferred. There was substantial evidence to sustain the convictions of assault with intent to commit murder.

Adequacy of the evidence to sustain Otwell's conviction of the conspiracy charge is another matter. The evidentiary requirements of criminal conspiracy are succinctly stated in *People* v. *Causey,* 220 Cal.App.2d 641, 653-654 [34 Cal.Rptr. 43]: "The gist of a criminal conspiracy is a corrupt agreement of two or more persons to commit an offense prohibited by statute, accompanied by some overt act in furtherance of the objects of the agreement. [Citations.] The existence of the conspiracy may be established by circumstantial evidence. [Citation.] The agreement may be inferred from the acts and conduct of the defendants in mutually carrying out a common purpose in violation of the statute [citations], but it need not be shown that the parties met and agreed to undertake the unlawful acts. [Citation.] It is not necessary that the overt acts be criminal. [Citation.] If such acts are done as a step toward the furtherance of the conspiracy they are sufficient. [Citation.] The overt act may be performed by only one of

the conspirators and yet be sufficient, for the members of the conspiracy are bound by all acts of all members done in furtherance of the agreed plot. [Citations.] ▮▮▮ Finally, once the conspiracy is established all evidence of the substantive crimes becomes admissible against all participants, even though the other conspirators were not present. [Citations.]''

There is no evidence of prior acquaintance between defendants and the group of boys. After the initial encounter between the two groups, each group left the scene and defendants went into the Miner's Cafe without any realization or expectation that Lonnie Barnard and his companions would return. So far as defendants were concerned, the affair had terminated. Although the People now contend that the initial encounter furnishes evidence of a continuing plan or conspiracy, the prosecution's own witnesses demonstrated that it was Lonnie Barnard and his companions who conceived the notion of collecting reinforcements and of going to the cafe to fight defendants. They found defendants seated inside the cafe, or in Butts' case (according to his own testimony) on the way to the bathroom to vomit. At that point Barnard and his companions challenged defendants to fight. Up to that point, there is not a shred of evidence to support even the faintest inference that defendants evolved a mutual plan or design to fight. Up to that point, any conspiracy to commit assault must be ascribed to Barnard and his companions rather than defendants.

There is no California decision on the question whether conspiracy to commit assault can be found from evidence that two persons simultaneously accept a challenge to combat. *People* v. *Osslo,* 50 Cal.2d 75 [323 P.2d 397], upholds a conspiracy-assault conviction on evidence of a plan or scheme to recruit thugs to initiate violence. *People* v. *McManis,* 122 Cal.App.2d 891 [266 P.2d 134], upholds a finding of conspiratorial assault (resulting in common liability for manslaughter) where the defendants led a gang which started a brawl outside a drive-in restaurant. In each of these cases the accused persons conceived and carried out a program of aggression (see also *People* v. *Wooten,* 162 Cal.App.2d 804 [328 P.2d 1040]). Here, in contrast, defendants did not initiate the affray which culminated in the fight and the stabbings.

In leaving the cafe and walking toward the parking lot with Barnard and his companions, defendants of course exhibited a resolve to fight. That decision was not conspira-

torial unless it was jointly conceived. Regardless of the law's frowns, a sizeable segment of mankind holds the belief that rejection of a challenge to fight is cowardice. When an individual member of this segment of mankind individually responds to such a challenge, he simply conforms to a behavior pattern fixed by group mores. When two members of this segment of mankind simultaneously respond to a single challenge, they exhibit no more than the separate responses which they would display as individuals. To all appearances their simultaneous actions are the product not of an agreement but of their separate, individual motivations. Although simultaneity ordinarily provides an inference of concerted action, it cannot do so here since both defendants acted in response to a single challenge simultaneously addressed to each.

While no California case has ruled expressly on the matter, it seems to be well established that when two persons voluntarily engage in a fight, each is guilty· of assault. (*State* v. *Mace*, 86 Ariz. 85 [340 P.2d 994]; 6 C.J.S., Assault and Battery, § 90, p. 941.) Here our concern is not with the assault itself, but with the crime of conspiracy, a separate substantive offense from any crime committed pursuant to or as a result of it. ▮ The crime requires some evidence of an agreement or joint design, however circumstantial. Where the defendants do not initiate aggressive action but are themselves challenged to fight, it is not reasonable to infer such an agreement or design from the bare fact of their simultaneous acceptance of the challenge. Proof of conspiracy in such case must rest upon some additional evidence of a jointly conceived plan or design to engage in physical violence.

▮ The ensuing series of actions, comprising the actual start of physical violence, does not fill the evidentiary hiatus. Larry Herd and Jack Herd testified that Lonnie Barnard and Tom Abreu walked toward the rear of the cafe, with defendants following 5 or 6 feet behind, when Butts suddenly ran toward Tom Abreu and swung and kicked at him. Neither could state who first initiated action in the fight between Otwell and Barnard. Gerald Brewton testified that he was with Barnard and Tom Abreu; that Butts suddenly ran toward Abreu; that several boys called out a warning to Abreu; that Butts kicked and swung at Abreu, who turned around to face Butts; that Brewton and Lonnie Barnard then turned around and looked at Otwell, who then came toward Lonnie and kicked at him. Thus the defendants did not simultaneously open the combat. The next sequence of

events has each defendant engaged in a separate affray, Butts absorbing punches from two opponents and Otwell wielding a knife on three successive opponents. When Otwell's end of the affray broke off, he advanced toward the Butts fight. Butts' opponents fell back when they heard shouted warnings of a knife. At that point defendants advanced together toward the boys who were trying to drag Lonnie Barnard from the area. After a barrage of rocks defendants left together. These events portray nothing more than the individual actions of two persons who were cast as allies by a joint challenge, who reacted as individuals protecting their common interests and then, having gained dominance through Otwell's vicious and unjustified use of a knife, reached a joint decision to break off the encounter. None of these actions supplies any inference of a preexisting agreement, however brief, between these defendants to initiate aggressive action. We hold that there is no evidence from which the jury could reasonably infer a joint agreement, plot or conspiracy by defendants to commit an assault.

At this point we reach the inquiry imposed by the Supreme Court's transfer order, that of deciding whether the comment and instruction on Otwell's failure to testify constituted prejudicial error under article VI, section 4½, of the state Constitution. ▆▆ Earlier in this opinion we in. quired into the evidence for the purpose of deciding whethe: the guilty verdicts of assault with intent to commit murde: were supported by substantial evidence. That inquiry was ' relatively narrow one, measured by the rule that " 'it is the trier of fact, not the appellate court, that must be convinced of a defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' " (*People* v. *Hillery, supra,* 62 Cal.2d at p. 702, quoting from *People* v. *Robillard,* 55 Cal.2d 88, 93 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086].) In that narrow inquiry we set to one side inferences favorable to the defendant which the jury might have drawn but did not. (See *People* v. *Daugherty, supra,* 40 Cal.2d at pp. 885-886.)

Here we reach a different stage of review, calling for a broader and more active consideration of the evidence. ▆▆ In appraising the prejudicial effect of trial court error, an appellate court does not halt on the rim of substantial evidence or ignore reasonable inferences favoring the appel-

lant. Article VI, section 4½, instructs the reviewing court to reach its own "opinion" whether the error resulted in a miscarriage of justice. We cannot of course actually know what motivated the 12 jurors who decided the case. We do examine and weigh the evidence with the objective of formulating an opinion as to the degree of probable influence which the error exerted on the jury. (See *People* v. *Dail,* 22 Cal.2d 642, 659 [140 P.2d 828]; Stout, *Appellate Review of Criminal Convictions on Appeal,* 43 Cal.L.Rev. 381, 384-386; Traynor, *Some Open Questions on the Work of the State Appellate Courts,* 24 U. of Chi. L.Rev. 211, 223-224.)

In viewing the eyewitness testimony at Otwell's trial, one is immediately impressed by the mass of incrimination, hardly to be dented let alone shaken, by the relatively puny force of the comment and instruction on his failure to testify. Seven witnesses described the fight; the condition of the wounded boys was described by others. However unconstitutional the comment and instruction on Otwell's failure to take the stand, it could hardly have altered the jury's view of the external events described by these witnesses.

Guilt, nevertheless, turned not alone on external events but on questions of criminal intent, that is, the jury's evaluation of the comparatively unexposed state of Otwell's mind. That evaluation rested on circumstantial evidence. To reach findings of intent the jury had to draw inferences from the external events. If the error influenced the jury in any measurable degree, it was at the points where intent was in issue. As we noted earlier, second degree murder includes killings where intent is implied; thus the jury could have rendered the second degree murder verdict without finding that Otwell had a specific intent to take the life of Lonnie Barnard. (*Jackson* v. *Superior Court, supra,* 62 Cal.2d at pp. 525-527.) The verdicts of assault with intent to commit murder demanded proof of specific intent to take the lives of Joe Abreu and David Brewton.

There was evidence to spare, supplying extremely strong inferences of the implied malice and absence of justification which are ingredients of second degree murder. Challenged to a fist fight, Otwell had resorted to a concealed knife. If his purpose had been only to protect himself, to extricate himself from a fear-arousing situation, he might have given warning, might have threatened his unarmed opponents with use of the knife. Instead, he chose to slash or stab without warning. With this evidence before them, the

jurors were properly instructed that "the unlawful killing of a human being with malice aforethought, but without a deliberately formed and premeditated intent to kill, is murder of the second degree." (See CALJIC No. 305.) The trial court also told the jurors that malice aforethought "is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (See CALJIC No. 301.) In view of the evidence and of these instructions, a verdict of acquittal or of guilt of a lesser offense would have been a veritable blunder. There is no reasonable probability that the error influenced the second degree murder verdict. Relative to the second degree murder conviction, the error was harmless.

 In the course of instructions on the offense of assault with intent to commit murder, the trial judge properly told the jury that proof of specific intent to kill was required. (See CALJIC No. 609.) Specific intent is intent which is " 'precisely formulated . . . of an exact or particular nature.' " (*People* v. *Thomas, supra,* 25 Cal.2d 880, 898.) In order to convict Otwell of assault with intent to murder Abreu and Brewton, the jury had to be convinced beyond a reasonable doubt that Otwell had attacked these persons with a precisely formulated purpose to kill them. Evidence of that purpose, as we have observed, was circumstantial. Although the jury could reasonably draw from it the inference of specific intent to kill, it might also have rejected the inference. The jury might have chosen to infer that Otwell knifed Abreu and Brewton with the vicious but undifferentiated impulses of a man who wanted to hurt, to wound, to inflict pain or fright, to do anything and everything which would get him through the encounter unscathed. Drawing the latter inference would perforce demand rejection of the inference of specific intent to inflict death. Conflicting and equally available inferences could have been drawn from the same body of evidence. (Cf. *People* v. *Teale,* 63 Cal.2d 178, 196-197 [45 Cal.Rptr. 729, 404 P.2d 209].) A finding that there was no specific intent to kill was as reasonably probable as the finding of its presence. With these probabilities so closely in balance, the error may have tipped the scales against the defendant. (*People* v. *Watson, supra,* 46 Cal.2d at p. 837.) Relative to the verdicts on the charges of assault with intent to commit murder, the error was prejudicial and requires reversal.

The judgment of conviction of second degree murder is affirmed. The judgment convicting Otwell of two assaults

with intent to commit murder is reversed. The judgment convicting Otwell of conspiracy to commit assault is reversed with directions to dismiss the conspiracy charge.

## Appeal of Butts

 Butts argues with some force that he is liable neither for Otwell's use of a knife nor for the resulting death, use of a knife being outside the scope of the asserted conspiracy. (See *People* v. *Werner,* 16 Cal.2d 216, 223 [105 P.2d 927]; 1 Witkin, Cal. Crimes (1963) pp. 114-115.) The absence of substantial evidence requires reversal of Butts' conviction of conspiracy equally with Otwell's.

In response to the joint charge of murdering Lonnie Barnard, the jury found Butts guilty of involuntary manslaughter.[2] The trial court properly instructed the jury not only on the definition and requirements of conspiracy, but also that one who aids and abets another is guilty of the other's crime. The jury were also supplied with instructions permitting voluntary and involuntary manslaughter verdicts. Conceivably the jury could have fastened Butts with liability (however reduced) for the homicide committed by his codefendant on the theory that he aided and abetted his codefendant. The verdict on the conspiracy count demonstrates that the jury found Butts guilty of homicide not as an aider and abettor but as a conspirator. The failure of the conspiracy charge thus results in a reversal of the involuntary manslaughter verdict against Butts.

 Failure of the conspiracy charge does not necessarily absolve Butts of liability for the homicide committed by Otwell. One may aid and abet a crime without having entered into a conspiracy to commit it. (*People* v. *Fleming,* 191 Cal.App.2d 163, 168 [12 Cal.Rptr. 530].) Our reversal of the involuntary manslaughter conviction will permit retrial of Butts (if the prosecution is so advised) on the theory that he was an aider and abettor.[3] For the guidance of the parties

---

[2] Penal Code section 192 defines manslaughter as "the unlawful killing of a human being without malice." Subdivision 2 of that section defines involuntary manslaughter:

"2. Involuntary—in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection; provided that this subdivision shall not apply to acts committed in the driving of a vehicle."

[3] In view of the present record, the possibility that the prosecution may muster up enough evidence to warrant jury consideration of Butts'

and the trial court in further proceedings, we have reviewed the record to ascertain whether it now embodies substantial evidence to justify a verdict or finding that Butts aided and abetted in a homicide committed by Otwell. It does not.

The test of aiding and abetting is whether the accused in any way, directly or indirectly, aided the perpetrator or advised and encouraged commission of the offense with knowledge of the latter's wrongful purpose. (*People* v. *Demes,* 220 Cal.App.2d 423, 432 [33 Cal.Rptr. 986]; *People* v. *Masters,* 219 Cal.App.2d 672, 679 [33 Cal.Rptr. 383].)

There must be proof that the accused not only aided the actor but at the same time shared the criminal intent. (*Pinell* v. *Superior Court,* 232 Cal.App.2d 284, 285 [42 Cal. Rptr. 676]; *People* v. *Kerrick,* 86 Cal.App. 542 [261 P. 756].) One may be guilty of aiding and abetting an assault when he serves as an ally of the aggressor in a fight, stands by to assist and eventually enters the affray, there being "concert of action and purpose." (*People* v. *Luna,* 140 Cal.App.2d 662, 665 [295 P.2d 457].) A defendant who stood by while his companion administered a terrific beating and who threatened any bystander who interfered, was guilty of second degree murder as an aider and abettor, since death was a "reasonable and natural consequence" of the beating. (*People* v. *Cayer,* 102 Cal.App.2d 643, 651 [228 P.2d 70].) It is not necessary that the primary actor expressly communicate his unlawful purpose, if that purpose is apparent from the circumstances and the secondary actor nevertheless assists in its accomplishment. (*People* v. *Grischott,* 107 Cal.App.2d 631, 634 [237 P. 2d 712].) An unarmed aider and abettor may be responsible in the same degree as the actual perpetrator. (*People* v. *Perkins,* 37 Cal.2d 62, 64 [230 P.2d 353].)

In implicating Butts as an aider and abettor in Otwell's use of a weapon likely to cause death, the prosecution evidence falls short of these standards. Aside from speculation and suspicion, there is no evidence that Butts advised and encouraged use of a knife, that he had advance knowledge of Otwell's wrongful purpose to use a knife or that he shared Otwell's criminal intent to resort to a dangerous weapon. There is no evidence that Otwell pulled or displayed the knife at any time before Butts rushed at Tom

liability as an aider and abetter seems quite remote. Perhaps the prosecution has other testimony and other witnesses. In any event we do not preclude a retrial if the prosecution wants one.

Abreu. From that point onward, the intoxicated Butts was thoroughly absorbed in absorbing punches from his two opponents. He could have had no awareness of the course of events in the Otwell-Barnard affray. The evidence shows Butts' awareness of participation in a fist fight, not a knife fight. Thus there is no substantial evidence upon which to base a finding of guilt of aiding and abetting in a homicide.

By parity of reasoning, there is no evidence which would justify an involuntary manslaughter verdict on the theory that Lonnie Barnard's death resulted from Butts' "commission of an unlawful act, not amounting to felony." (Pen. Code, § 192, subd. 2.) Barnard's death was not a reasonable and natural consequence of any unlawful act in which Butts knowingly participated. Butts' counsel cites *People* v. *Kerrick, supra,* 86 Cal.App. 542, which aptly demonstrates that something more than the defendant's participation in a common affray, however unlawful, is necessary to create manslaughter liability for the death of one of the participants. There must be a causal relationship between the unlawful act and the death. "We cannot ignore the element of causation in the unlawful act necessary to connect it with the offense. In our ordinary phraseology we refer to the result of this element by saying it must be the probable consequence naturally flowing from the commission of the unlawful act." (*People* v. *Kerrick, supra,* 86 Cal.App. at p. 548; see also 1 Witkin, Cal. Crimes (1963) p. 310.)

As to the judgment convicting him of simple assault upon Joe Abreu and Gerald David Brewton, Butts points out that there is no evidence that he attacked or was engaged in any fight with either of these two persons. It is evident that the jury found him guilty of assault in his asserted role as a conspirator. Reversal of the conspiracy conviction thus necessitates reversal of the assault convictions.

As to defendant Butts, the judgment of conviction of conspiracy is reversed with directions to dismiss the charge. The judgment of conviction of involuntary manslaughter and of two counts of simple assault is reversed with directions that he be retried on any or all of those charges if the People so elect.

Pierce, P. J., and Regan, J., concurred.

The petition of appellant Otwell for a hearing by the Supreme Court was denied November 10, 1965.