Filed 6/24/13  P. v. Hernandez CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LINO F. HERNANDEZ et al.,<br><br>    Defendants and Appellants. | 2d Crim. No. B229363<br>(Super. Ct. No. 200800611)<br>(Ventura County) |

Lino F. Hernandez, Alvino Joe Hernandez, and Alejandro Salas appeal from the judgments following their convictions by jury of one murder and three attempted murders.  (Pen. Code, §§ 187, subd. (a), 189; 664/187, subd. (a).)[1]  The jury convicted Salas of second degree murder, and convicted Lino and Alvino of first degree murder, with a true finding as to a gang special circumstance allegation.[2]  (§§ 187, subd. (a), 189; 190.2, subd. (a)(22).)  The jury also found true allegations that appellants' crimes were committed for the benefit of, in association with, or at the direction of a criminal street gang (§ 186.22, subd. (b)(1)); a principal personally used a firearm in the crimes (§ 12022.53, subd. (e)(1)); and Lino personally inflicted great bodily injury in their commission (§ 12022.7, subd. (a)).

_____

[1] All statutory references are to the Penal Code unless otherwise stated.

[2] There are numerous parties and witnesses in this case with the last name Hernandez or Lopez.  For the sake of clarity, we will refer to them by their first names.

Appellants raise multiple challenges to the sufficiency of the evidence to support the findings and verdicts: Alvino and Salas challenge the gang enhancement findings; Alvino and Lino challenge the gang special circumstance findings; and Salas challenges his second degree murder and attempted murder convictions. Appellants also contend that the trial court committed multiple prejudicial instructional and evidentiary errors that violated their constitutional rights. Alvino claims that the trial court cited improper factors as justification for imposing consecutive sentences for the three attempted murders.[3] We affirm.

## BACKGROUND

Lino, Alvino and Salas are members of Colonia Chiques (Colonia). Colonia claims a large section of Oxnard as its territory. Lino, Alvino and Salas were known as Veneno, Flaco and Barbs, respectively. They all had Colonia tattoos. Lino's tattoos included a large star on his neck and chin, in line with Colonia's use of Dallas Cowboy symbols, and another that said "187 River Rat," referring to a rival gang, and the Penal Code section for murder.

Oxnard Police Department Sergeant Christopher Williams testified as the primary prosecution gang expert witness at trial. He worked for the Department for four years, with more than 200 hours of formal criminal gang training. Williams explained that gang members gain respect and power in their gang by committing violent crimes. Gangs honor members who are killed "for their cause" as "fallen soldiers." Colonia was "one of the most violent" gangs in Ventura County.

---

[3] Respondent argues that certain issues are not properly before this court because they were not raised in the trial court. (See, e.g., Salas's objection regarding gang expert testimony and Alvino's sentencing claim.) In the interest of judicial economy, we set waiver aside and consider such issues on the merits. In the same vein, we do not discuss ineffective assistance of counsel issues that relate to harmless errors or meritless claims of error. (See *Strickland v. Washington* (1984) 466 U.S. 668, 694 [Ineffective assistance of counsel claims require a showing that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."])

As the senior officer in the gang unit, Williams managed the enforcement of the injunction Oxnard obtained against Colonia, based on crimes it committed between 1999 and 2003. The injunction prohibits Colonia members from associating with each other, wearing gang clothing, flashing gang signs, and drinking or possessing alcohol. It also subjects them to a 10:00 p.m. curfew. Williams had personally talked with more than 200 gang members, and listened to Colonia members planning crimes and discussing gang matters while monitoring wiretapped conversations. Williams testified that Colonia's primary purpose was committing crimes to dominate a large section of Oxnard which it claimed as its territory. He illustrated their criminal activity by describing a small sample of their crimes, including armed robbery, assault with a deadly weapon, and murder or manslaughter.[4]

In 2006, Alvino lived with his family in an apartment building at 2011 North Ventura Road in Oxnard (2011 building), north of the traditional Colonia territory. Salas and his family also lived in that building. The murder and attempted murders occurred in the courtyard of another building on the same block, at 2045 Ventura Road, where victim Abraham Lopez lived with his brothers Moises Lopez and Hector Lopez (Lopez building, or Lopez apartment). The 2011 building and the Lopez building are 416 feet apart.

Abraham and Hector belonged to a tagging group called "DSK," which had about 20 members. DSK stood for "Dark Side Krew," (or "Don't Stop Krew," "Down Southern Kalifornia," or "Dark Side Killers"). Moises associated with DSK. Their oldest brother, 29-year-old Octavio Lopez, lived nearby and often visited the Lopez apartment, but he was not a DSK member or associate.

DSK was mainly devoted to "tagging" property with its graffiti. It also defaced other groups' graffiti. DSK sometimes fought against other tagging groups. Some DSK members owned and carried weapons.

---

[4] Williams provided a brief description of each crime: an armed robbery on November 5, 2004, a shooting on December 12, 2004, an assault with a deadly weapon on April 8, 2005, a fatal shooting on March 5, 2005, and a shooting on July 18, 2004.

DSK member Richard Gonzalez grew up in Colonia territory. Colonia members once jumped Gonzales, while he sat on his porch, in retaliation for his tagging in Colonia territory. Colonia members also jumped Moises at McDonald's when he wore a White Sox baseball cap like those worn by Southside Chiques, one of Colonia's rival gangs. Salas, Alvino and other Colonia members drove to the home of DSK Johnny Rocha and stood outside yelling at him. Colonia members also gathered outside the Lopez apartment and yelled at its occupants.

In 2006, Salas, Alvino, Andy Sanchez (Panda) and other Colonia members regularly congregated at the Lopez building mailbox area. That made Hector feel intimidated when he went to get his mail. DSK and Colonia members crossed out each other's graffiti near the Lopez building.

On May 5, 2006, Gonzalez went to a party at the Lopez apartment. During the party, two Colonia members, including Panda, jumped DSK member Jose Delgadillo (Ohno) in the alley behind the Lopez building. After Gonzalez said, "one on one," Panda fought Ohno, while the other Colonia member fought Gonzales. Ohno knocked out Panda's tooth.

Sometime later, before September 2006, Colonia and DSK arranged for Panda and Ohno to fistfight again, "to stop problems." Alvino and Salas accompanied Panda to the alley behind the Lopez building. Panda and Ohno had just started fighting when two more Colonia members arrived, armed with aluminum baseball bats. Abraham, Moises, Hector and his friend Ralph, and a teenager were there. Abraham or Moises yelled something like, "I thought this was supposed to be a fistfight. You guys bring weapons." Alvino held a knife against the teenager and said, "Well, grab your own bats." Hector said, "Let him go." A Colonia member struck Moises with a bat, which Moises grabbed and held. Ralph picked up a stick. Things ended when Alvino pushed the teenager toward Hector.

In early August 2006, the ongoing conflict with Colonia led Abraham to acquire a .380-caliber handgun (.380). Gonzalez acquired a .357-caliber handgun

4

(.357).  Hector moved to Arizona in August 2006, to avoid the escalating Colonia-DSK conflicts.

*Labor Day Shootings (September 4, 2006)*

September 4, 2006, was Labor Day and Gonzalez's 21st birthday.  He spent the day shopping with Octavio and Moises.  Octavio drove them back to the Lopez building in the late afternoon.  Salas approached Octavio's car.  When Octavio stopped the car, Salas said he wanted to arrange a fistfight between a Colonia member and "Johnny."  Octavio agreed to help arrange it.  Gonzalez, Moises and Octavio went to the Lopez apartment, and drank beer.

Moises's girlfriend, Michele White, drove to the Lopez building at around 6:30 p.m. on September 4, 2006, to retrieve her game console from Moises.  White saw Salas's brother-in-law, Alonzo Hernandez, make a crude gesture at Moises while she was outside with him.  Salas, Alvino, and Lino then approached White and Moises.  Moises called his brothers to warn them that they were there, and asked them to bring a gun.

Moises and White entered the courtyard from the alley.  Salas, Alvino, and Lino followed and surrounded them.  (The courtyard was bordered by an alley on the west, the Lopez building on the south, Ventura Road on the east, and the building at 2051 North Ventura Road on the north.)

Octavio, Abraham, Moises, and Gonzalez went downstairs and entered the courtyard.  Gonzalez, who was right-handed, carried a beer in his right hand.  He had a gun in his waistband, under his shirt.  Moises told White to go upstairs.  White started to walk toward Ventura Road but turned back after Lino said, "Where are you going?  It's all right.  Nothing's going to happen."  White stopped in the northeast section of the courtyard, just north of the central walkway that led to Ventura Road.  The DSK and Colonia members were closer to the alley, at the west end of the courtyard.

Octavio and Abraham were in the southwest section of the courtyard, facing Lino and Alvino, who were a couple of feet north of them.  Lino and Alvino each hid a gun beneath his sweatshirt.  Octavio wore shorts, a t-shirt, and flip-flops. Gonzales

5

was a foot or two behind Octavio and Abraham.  Moises had moved to the northwest section of the courtyard, east of Alvino and Lino.

Addressing Octavio, Lino said, "My carnal [brother] wants you to keep his name out of your fucking mouth."  He asked Octavio, "Who is going to get down [fight]?"  Octavio responded that he was willing to fight, as long as no weapons were used.  Pointing at Lino's sweatshirt (which then covered a semi-automatic TEC-9 "machine gun" with an attached clip), Octavio asked, "What's that you got there?"  Lino pulled out the TEC-9 and started firing immediately.  Alvino pulled out a nine millimeter Makarov handgun and fired it.  Several shots hit Octavio, and he fell.

When the shooting started, Gonzalez dropped his beer can and started to run away.  Seven shots hit him, and he fell.  Gonzalez then aimed his .357 toward Lino, fired several times, and tossed it in the bushes.  White was still in the northeast section of the courtyard, when a bullet struck her leg.  She fell and lay still.

After Lino and Alvino started shooting, several bullets hit Abraham.  He fell, loaded his .380, and fired it.  While Abraham was down, Alvino pistol-whipped and shot him in the face.  Alvino took Abraham's .380 and ran away with Lino.

Oxnard Police Department Officer Jeffrey McGreevy was working on September 4, 2006.  He heard gunshots at approximately 6:50 p.m. and arrived at the Lopez building minutes later.  McGreevy found Octavio, Abraham, White, and Gonzalez lying in the courtyard.  Octavio was not responsive, and lay face down with blood pooling under his head and chest.  There was a beer can near Gonzalez.  Moises was also there, trying to help Octavio.  When McGreevy asked Abraham, Moises, Gonzalez, and White if they knew who the shooters were, they refused to answer or said they did not know.[5]

Police at the crime scene recovered 21 expended casings from a semi-automatic TEC-9 weapon; an expended casing from a nine millimeter Makarov

_____

[5] Abraham, Gonzalez and White made statements before trial that were inconsistent with their trial testimony.  Gonzalez entered a witness protection program and received $58,000, to relocate his family.

6

handgun; two expended casings and one misfired bullet from a .380 caliber handgun; and six expended casings from a .357 revolver. They found a .357 near the spot where McGreevy found Gonzalez.[6]

Several days later, an officer stopped a car in Oxnard. Alvino and his family were in the car, which contained a Makarov handgun; a TEC-9; a nine millimeter magazine with live rounds; and a TEC-9 magazine. Analyses connected those weapons to evidence from the Lopez courtyard and the shooting victims.

Octavio died within minutes of receiving four gunshot wounds. Bullets pierced his carotid artery and aorta. The surviving victims required hospitalization and extensive treatment, including surgery. Abraham lost an eye and suffered other wounds in his chest, shoulder, forearm, face, legs, and buttocks. Two bullets remain in his head. Gonzalez suffered permanent, disabling nerve damage, lost the ability to move his left foot, and needed a leg brace. Bullets remain in his right shin. White suffered a gunshot wound that pierced an artery and left numbness in her left leg.

Police officers interviewed Lino on September 26, 2006, and Salas on October 4, 2006. Both men denied that they were in Oxnard at the time of the shootings. Each man claimed he no longer associated with Colonia. Salas denied knowing DSK members Abraham, Octavio, Moises, Neil Glass, or their fellow DSK member, Johnny Rocha. Salas initially denied knowing Alvino and Lino, then said he knew them vaguely. Lino claimed that he had not handled a TEC-9 in several years.

Officers recovered Abraham's .380 from a Camarillo home where Lino reportedly lived. Police again interviewed Lino on February 26, 2007. When they advised him that the TEC-9 contained his DNA, he did not admit he used it, or offer any explanation. He did admit he owned the .380 handgun. Upon learning it had fired casings recovered from the shooting scene, he said he often loaned it to others. He refused to identify the person who returned the gun to him after Labor Day. He still denied any involvement in the shooting.

_____

[6] Officers later found .380 ammunition, .22 ammunition and an empty box of .357 ammunition in the Lopez apartment.

Officers re-interviewed Salas on January 14, 2008. He again denied that he was in Oxnard on Labor Day and claimed he did not associate with Colonia. Elizabeth Aragon, the mother of Anna Hernandez (Salas's girlfriend) initially told officers that Salas was with her family in Bellflower on Labor Day. She later disclosed that Salas had not been with them, and that Anna had pressured her to provide a false alibi to help Salas.

*Defense Case*

Alvino testified on his own behalf. He said it is hard for him to "see even with the glasses" because he has "keratoconus in [his] left eye and [an] astigmatism in [his] right eye." He admitted prior robbery and weapon possession convictions. Alvino had belonged to Colonia for many years. He always carried a firearm when he left home, because he anticipated he could encounter a rival at any time, and such encounters can easily erupt into deadly violence.

Alvino testified about the second Ohno-Panda fistfight. Alvino, Salas, and Panda met Abraham, Moises, Glass, Gonzalez and Ohno in the alley behind the Lopez building. Just after Panda and Ohno started fighting, two more Colonia members arrived; one of them held a baseball bat. After a "little ruckus" erupted, someone from DSK, possibly Gonzalez, said "grab a cuete [gun]." Alvino pulled out a knife, grabbed Ohno, and threatened to stab him. Alvino did not see any DSK member with a weapon. Alvino also testified that on another occasion, he saw DSK members and heard gunshots "a couple minutes later."

According to Alvino, on Labor Day, September 4, 2006, he was drinking with Lino, a Colonia member named Herbie, and a Colonia associate named Abel when Salas called him. Salas said there was going to be a fight between a Colonia member and a DSK member, and asked Alvino to provide "back up." Alvino assumed Salas would be fighting.

Approximately 90 minutes after receiving Salas's call, Alvino, Lino, and Abel rode with a man named "Loc" to a home near Salas's apartment. Alvino was carrying the TEC-9 and the Makarov. Because of recent DSK-Colonia incidents,

8

Alvino anticipated that DSK members would be armed. They met with Salas and Panda for about 20 minutes in an alley. Alvino gave Lino the TEC-9.

Carrying their weapons, Lino and Alvino started walking toward the Lopez building, followed by Salas and Abel. Alvino and Lino encountered Moises and White in the alley. Lino greeted White. Moises and White moved into the courtyard. Alvino and Lino followed and "crowded around" them.

Alvino saw Abraham and Octavio in the courtyard. Gonzalez came downstairs. He was drinking a beer. Lino spoke to Octavio, but Alvino could not hear what they said. Alvino had been "picking" at his waistband and Octavio asked what was in his waistband. Alvino then "got scared" when he saw Gonzalez "reaching toward his hip." He recalled that during the last Ohno-Panda fistfight, Gonzalez had said, "grab a cuete [gun]."

Before Gonzalez or anyone with DSK displayed a firearm, Alvino pulled out his gun, started shooting, and struck Gonzalez once. Alvino's gun then jammed and Lino started shooting. Abraham and Gonzales fired their guns. Alvino saw Abraham lying on the ground, aiming a gun at Lino. Alvino ran to Abraham, pistol-whipped him, and took his .380.

No bullets hit Alvino or Lino. They ran from the courtyard and Loc immediately drove them to their cousin Terry's house in south Oxnard. Alvino hid the TEC-9 and Makarov under the floorboards of Terry's house. Alvino later retrieved the weapons, with the intention of disposing of them. He threw away his clothing so the police would not find it.

The defense called several witnesses to describe statements made by prosecution witnesses that were contrary to their trial testimony. Oxnard Police Department Sergeant Terry Burr testified that Gonzalez previously told officers that the Colonia members actually were looking for Rocha on the day of the shooting. Because Rocha was not then at the Lopez apartment, Gonzalez and his friend went downstairs to confront the Colonia members. On the day of the shooting, White told Burr she had

9

known Abraham for years, and she had no current relationship with anyone living at the Lopez apartment.

DISCUSSION

*Substantial Evidence Supports the Section 186.22, subdivision (b)(1)(C) Gang Benefit Enhancement and the section 190.2, subdivision (a)(22) Special Circumstance*

Alvino and Salas challenge the sufficiency of the evidence supporting the jury's true finding on the section 186.22, subdivision (b)(1)(C) gang benefit enhancement. Alvino challenges the sufficiency of the evidence to support the section 190.2 special circumstance on the same ground. They claim that the evidence failed to establish that one of Colonia's primary activities included the commission of one or more of the crimes enumerated in section 186.22, subdivision (e). The record belies their claim.

When considering an attack on the sufficiency of evidence to support a criminal street gang enhancement, we view the record in the light most favorable to the judgment to determine whether it contains substantial evidence from which a reasonable trier of fact could find the enhancement true beyond a reasonable doubt. (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

Section 186.22, subdivision (f) defines a criminal street gang as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in [specified] paragraphs . . . of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." The "'criminal street gang'" component of a gang enhancement accordingly "requires proof of three essential elements." (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1222.) The second of those elements is "that the group has as one of its 'primary activities' the commission of one or more specified crimes." The specified crimes include assault with a deadly weapon, robbery, and murder or manslaughter. (§ 186, subd. (e)(1)-(3).)

10

Expert testimony is admissible to prove the elements of a criminal street gang enhancement.  (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 324 (*Sengpadychith*).)  An expert may testify about the size, composition, or existence of a gang, an individual's membership in a gang, the primary activities of a specific gang, the motivation for a particular crime, whether and how a crime was committed to benefit or promote a gang, and gang rivalries, tattoos, colors or attire.  (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 654-657, disapproved on another ground in *People v. Vang* (2011) 52 Cal.4th 1038, 1049-1050.)  To establish the nature of a gang's primary activities, the trier of fact may look to both past and present criminal activities of the gang, as well as the circumstances of the charged offense.  (*Sengpadychith,* at pp. 320, 323.)  "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute.  Also sufficient might be expert testimony . . . . "  (*Id*. at p. 324.)

In arguing that there is not sufficient evidence to support the gang benefit enhancement, Salas and Alvino rely on an inapposite case, *In re Alexander L.* (2007) 149 Cal.App.4th 605.  In *Alexander L.*, the gang expert's testimony with respect to the "primary activities" of section 186.22, subdivision (f), consisted solely of the following: "'I know they've committed quite a few assaults with a deadly weapon, several assaults. I know they've been involved in murders.  [¶]  I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, [and] narcotic violations.'"  (*Id*. at p. 611.)  The reviewing court found this testimony insufficient to sustain the gang enhancement because information establishing its reliability was never elicited from the expert at trial.  (*Id*. at p. 612.)  In contrast, such evidence was elicited here.  Williams gave detailed examples of Colonia crimes that occurred on specified dates, including armed robbery, fatal shootings, and assault with a deadly weapon.  The record includes certified copies of court records relating to each case described by him.  Williams

11

personally spoke with more than 200 Colonia members, conducted several wiretap operations and listened to Colonia members plan crimes and discuss "gang business."[7]

Lino challenges the sufficiency of the evidence to support the section 190.2 gang special circumstance. He claims that because he was in prison between 2004 and 2006, when Colonia members committed the predicate crimes described by Williams, there is not substantial evidence that he had actual knowledge of the criminal activities of other gang members.[8] We disagree.

In reviewing a claim that insufficient evidence supports a special circumstance finding, we "must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or special circumstance beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence . . . . We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. . . . If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638.)

The special circumstances allegation "does not require a defendant's subjective knowledge of particular crimes committed by gang members. . . ." (*People v. Carr* (2010) 190 Cal.App.4th 475, 488, fn. 13.) Rather, the prosecution must merely prove the defendant was aware of "the gang's illegal purposes." (*Id*. at p. 488.) There was ample evidence from which the jury could infer such awareness in this case. The jury could look to the circumstances of the charged offense in evaluating his awareness

---

[7] We reject Alvino's challenge to the sufficiency of the evidence to support the section 190.2, subdivision (a)(22) gang special circumstance, which is based on the same invalid ground as his challenge to the gang benefit enhancement.

[8] The defendant who committed the assault with a deadly weapon cited by Williams was sentenced in late August 2006, just days before the current crimes, when Lino was not in prison.

of the gang's criminal activities. (See *Sengapadychith, supra*, 26 Cal.4th at pp. 320, 323.) Lino made statements reflecting such knowledge on September 26, 2006, while speaking with detectives. For example, when a detective mentioned Colonia's conflicts with DSK, Lino made the following statements: "So I'm why would the homeys even really, you know, sweat . . . taggers when . . . we have rival gang members? [¶] And these guys are just, you know--just taggers. . . . You know, they're really no threat to us." "Tagging and gang banging is, you know, . . . two different thing[s]. [¶] . . . [¶] [Taggers] fight with paint. You don't fight, you know, guns, knives, bricks, cars. . . . [E]verything goes in gang banging." "I was out there as a teen running around, you know, puttin' in work."

### *The Trial Court Acted Within Its Discretion in Denying the Mistrial Motion*

We reject Lino's contention that the trial court abused its discretion when it denied his motion for a mistrial after a gang expert witness referred to a carjacking and Lino's prison tattoo. We review the denial of a mistrial motion for an abuse of discretion. (*People v. Valdez* (2004) 32 Cal.4th 73, 128.) The court must grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged. "'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 573.)

During questioning about Lino's gang membership, Sergeant Williams testified that "[o]n 9/26 of '06 he told Detective Young that he got his star tattoos while he was in prison." The prosecutor immediately asked for a sidebar conference, noted that she and counsel for Lino had specifically directed Williams not to mention Lino's time in prison, and opined that Sergeant Williams had mistakenly read that detail from his written notes. Lino's counsel requested a mistrial. The court indicated it would consider it later. After Williams resumed testifying, he mentioned that Lino and other gang members were stopped in a carjacked car. The court immediately instructed the jury that it could not accept Williams's factual assertions as true because they were not based on personal knowledge. Lino renewed his mistrial motion. The court denied it,

13

and later denied a new trial motion that was in part based on the prison tattoo and carjacking references.

Lino fails to demonstrate that Williams' brief reference to Lino's prison tattoo and his presence in a carjacked car deprived him of a fair trial. (*People v. Avila, supra,* 38 Cal.4th at p. 573.) There was no suggestion that he was in prison for a violent crime, or convicted of carjacking. The court deferred to counsel's preference against an admonition regarding the prison reference. Lino argues that it was "far less likely that a juror [would] believe a claim of self-defense from somebody who's been in prison and involved in carjacking than they would from somebody with no prior arrest record or prison term." The expert's references were far less prejudicial than other evidence presented at trial, including Lino's repeated denials that he was even at the shooting scene, and statements he made to detectives about his gangbanging.

### *Evidentiary Claims*[9]

Appellants argue that the trial court committed reversible error and violated their federal constitutional due process rights by admitting certain evidence. They claim that the court should have excluded such evidence, among other reasons, because it was unduly prejudicial under Evidence Code section 352. We disagree.

The trial court has discretion to exclude such evidence where it is more prejudicial than probative. (Evid. Code, § 352.) Evidence Code section 352 provides that evidence may be excluded "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "Prejudice" within the meaning of Evidence Code section 352 pertains to evidence tending to evoke an emotional bias against a party, with little relevance to the issues. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070-1071.) A court's determination that evidence is not made inadmissible by Evidence Code section 352 will be upheld on appeal unless the trial court "'exercised its discretion in an arbitrary, capricious or

---

[9] Alvino filed a motion to join in Lino's and Salas's claims. We grant his motion.

14

patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

Salas asserts that the trial court committed reversible error and violated his federal constitutional due process rights by admitting irrelevant evidence regarding an affair between his girlfriend, Anna, and DSK member Neil Glass. He claims that the court should have excluded that evidence because it was irrelevant, and unduly prejudicial under Evidence Code section 352. We disagree.

As he did at trial, Salas contends that the Anna-Glass affair evidence was irrelevant because there was no direct evidence, or any evidence that showed he knew of the affair. The trial court did not abuse its discretion in admitting evidence of the affair. Several witnesses testified about the affair, including White, Gonzalez, and Hector. Hector, Glass, Anna and her sister were in a car after midnight on June 4, 2006, when a police officer stopped them and arrested Glass. Anna hugged Glass before he was taken away. Anna spent the night with Glass at the Lopez apartment on one night in August 2006. Gonzales testified that he told Abraham and Moises that the Anna-Glass relationship could cause the Colonia-DSK problems to "escalate." There was ample circumstantial evidence to support the inference that Salas knew of the affair. He lived in a building on the same block as the Lopez building, and spent a lot of time in the vicinity. He congregated with other Colonia members at the Lopez building mailbox area, and was often in the adjacent alley. If the affair evidence had any prejudicial impact, it was minimal, compared with other evidence directly linking Salas to Colonia-DSK conflicts. Salas was present and/or participated when Colonia members yelled outside Rocha's home; when they yelled outside the Lopez apartment; when Ohno fought against and knocked out Panda's tooth; and during the second Ohno-Panda fistfight, when armed Colonia members accompanied Panda. Salas also arranged the fatal Labor Day fight.

Lino argues that the trial court committed reversible error by admitting statements he wrote in a letter to Philip Hernandez, his younger brother. He argues that evidence should have been excluded as inadmissible character evidence (Evid. Code,

15

§ 1101) and because its prejudicial impact outweighed its probative value (Evid. Code, § 352). We disagree.

This contention concerns a letter dated March 7, 2004. The prosecution sought to introduce the entire letter which contained Lino's statements regarding his reputation for violence. The trial court carefully reviewed the letter and considered argument during multiple in limine sessions. The prosecution claimed the letter was relevant to show Lino's state of mind. Lino's counsel argued that the letter had minimal probative value because Lino wrote it two and a half years before he shot the victims. The court excluded most of the letter, and admitted only two statements, which follow: "Never back down from a fight no matter who's around. Take the first punk and don't stop." [10]

The challenged statements were admissible to show Lino's state of mind, pursuant to Evidence Code sections 1250, subdivision (a), and 1252. (See *People v. Spector* (2011) 194 Cal.App.4th 1335, 1393-1395 [threats defendant made more than 10 years before shooting a victim were admissible to show the defendant's state of mind].) The court did not abuse its discretion in admitting the letter. It weighed the prejudicial impact of the letter against its probative value and excluded highly prejudicial statements. (Evid. Code, § 352.) Further, any error associated with the admission of statements from the letter was harmless under either the California reasonable probability test or the federal beyond a reasonable doubt test, in view of the overwhelming evidence against Lino and his accomplices. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24.)

*Gang Expert Testimony*

We reject Salas's contention that the trial court committed prejudicial error by allowing Williams, the gang expert, to answer hypothetical questions regarding the

---

[10] Some of the excluded statements follow: "[A]ll my homies know me and know I'm no punk. . . . Plus I don't think no one will fuck with you if they know me 'cause I'll cut their fuckin' balls off and make them swallow them. If anyone gives you shit, let me know."

16

probable reaction of Colonia members if they learned of the Anna-Glass affair. He argues that the hypothetical questions were not based on facts, and the court improperly permitted Williams to impute knowledge of the affair to Salas. The expert opinion regarding the affair had little, if any, prejudicial impact, particularly if the jury concluded Colonia knew nothing about it. Moreover, as we have explained, the jurors heard far more prejudicial evidence that directly linked Salas to the ongoing Colonia-DSK conflicts. Thus, any error associated with the expert opinion regarding the affair was harmless under any standard of review. (*Chapman v. California, supra*, 386 U.S. 18, 24; *People v. Watson, supra*, 46 Cal.23 818, 836.)

*Instructional Error Claims*

In reviewing claims of instructional error or ambiguity, we presume "jurors understand and follow instructions" (*People v. Yeoman* (2003) 31 Cal.4th 93, 139), and "consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled." (*People v. Tate* (2010) 49 Cal.4th 635, 696.) "'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111-1112.)

*Natural and Probable Consequences Instruction (CALCRIM No. 402)*

Appellants make several related arguments that the trial court erred by instructing the jury with CALCRIM No. 402 that a defendant could be guilty of murder if he aided and abetted a conspiracy to commit battery, in which a natural and probable consequence was murder. The court instructed the jury with the following version of CALCRIM No. 402: "Before you may decide whether a Defendant is guilty of murder or attempted murder using the theory that murder or attempted murder was a natural and probable consequence of conspiracy to commit battery, you must decide whether he is guilty of conspiracy to commit battery. . . . [I]f the Defendant is guilty of murder or attempted murder using the theory that murder or attempted murder was a natural and probable consequence of conspiracy to commit battery, the People must prove that, one, the Defendant is guilty of conspiracy to commit battery; two, during the commission of

17

conspiracy to commit battery a co-participant in that conspiracy to commit battery committed the crime of murder or attempted murder; and, three, under all the circumstances, a reasonable person in the Defendant's position would have known that the commission of the murder or attempted murder was a natural and a probable consequence of the commission of the conspiracy to commit battery."

Joined by Alvino and Lino, Salas claims that there is not sufficient evidence to support the use of CALCRIM No. 402 because they did not conspire to commit a battery. We reject this claim because it rests on the invalid premise that a mutual agreement to engage in a fistfight is not a crime. (*People v. Moore* (2011) 51 Cal.4th 1104, 1136.) "Voluntary mutual combat outside the rules of sport is a breach of the peace, mutual consent is no justification, and both participants are guilty of criminal assault. [Citation.]" (*People v. Lucky* (1988) 45 Cal.3d 259, 291.)

Appellants also argue that there was no evidence of any conspiracy to support the use of CALCRIM No. 402 because Octavio, the murder victim, agreed to fight, and he could not conspire "against himself and [the] DSK members." This argument also fails. It is a variation of the invalid claim that a mutual agreement to engage in a fistfight is not a crime. Further, it rests in large part on an inapposite case, *People v. Butts* (1965) 236 Cal.App.2d 817, which did not involve gang crimes. The *Butts* court concluded, "Where the defendants do not initiate aggressive action but are themselves challenged to fight, it is not reasonable to infer such an agreement or design from the bare fact of their simultaneous acceptance of the challenge [and that] [p]roof of conspiracy in such case must rest upon some additional evidence of a jointly conceived plan or design to engage in physical violence." (*Id*. at p. 831.) Unlike *Butts*, it cannot be said here that the victims initiated the fistfight. Salas did. Substantial evidence supports the conclusion that Salas was the instigator.

The instant case closely parallels *People v. Montes* (1999) 74 Cal.App.4th 1050, which expressly declined to follow *Butts*. In *Montes*, the defendant and his gang confronted a member of a rival gang in a restaurant parking lot. During the confrontation, the defendant's fellow gang member shot and killed the rival gang

18

member. Two months earlier, at the same restaurant, the defendant and the rival/victim had been in an altercation. The *Montes* court held that attempted murder could be considered a natural and probable consequence of an assault against a rival gang member, whether or not the person who committed the assault knew that his fellow gang member had a weapon. (*Id.* at p. 1056.) As the *Montes* court observed: "When rival gangs clash today, verbal taunting can quickly give way to physical violence and gunfire. No one immersed in the gang culture is unaware of these realities, and we see no reason the courts should turn a blind eye to them. . . . [¶] [T]he circumstances in this case were such that it was reasonably foreseeable the initial confrontation would quickly escalate to gunfire." (*Ibid.*) As in *Montes*, there was sufficient evidence from which the jury could infer it was reasonably foreseeable that the fistfight would lead to fatal violence. Salas and Alvino had observed or participated in a recent Colonia-DSK (Panda-Ohno) fistfight in the Lopez alley during which Colonia members produced weapons (aluminum bats and a knife); Alvino then heard Gonzalez or another DSK member yell something like "grab a gun." Alvino testified that he always carried a firearm when leaving his home because he anticipated he could encounter a rival at any time, and such encounters can easily erupt into deadly violence. He also testified that recent DSK-Colonia incidents made him anticipate that DSK members would be armed on Labor Day.

Lino and Alvino also claim that the trial court erred by using an overly broad version of CALCRIM No. 402, to define the natural and probable consequence theory of guilt. They further claim that such error allowed the prosecutor to present the following legally erroneous theory to the jury: The jury could convict all three defendants of murder and attempted murder under the natural and probable consequences theory without making the required finding that at least one defendant perpetrated those crimes under an independent theory of guilt. We disagree.

The court instructed the jury with CALCRIM No. 402, that certain criteria must be met before it could find that any defendant was guilty under the natural and probable consequences theory. Those criteria include whether during the commission

19

of the conspiracy to battery "*a co-participant in that conspiracy to commit battery committed the crime of murder or attempted murder . . . .*"  (Italics added.)  During oral argument, Lino cited *People v. Morgan* (2007) 42 Cal.4th 593, 607-608, in claiming his conviction must be reversed because the prosecutor presented his case to the jury on a legally erroneous theory.  *Morgan* does not help Lino.  In *Morgan*, the jury convicted the defendant of several crimes, including kidnapping.  The kidnapping instruction required the jury to find the defendant moved the victim "*for a substantial distance, that is, a distance more than slight or trivial."*  (*Id.* at p. 605.)  In closing argument, the prosecutor argued that if the jury could find that the defendant moved the victim a "substantial distance, that increased her risk of harm," whether that was 37 feet, or longer, it could convict him of kidnapping.  (*Id.* at pp. 608, 609.)  However, 37 feet was "insufficient as a matter of law" (*id.* at p. 610) to establish kidnapping at the time of the crime, and the record suggested the jury could have relied on legally insufficient evidence in convicting the defendant of kidnapping.  The court therefore reversed his kidnapping conviction.  (*Id.* at pp. 610-611.)

Lino and Alvino claim that as in *Morgan*, it is possible that the prosecutor's arguments led the jurors to convict them without making a requisite finding.  We disagree.  In *Morgan*, the broad language of the kidnapping instruction allowed the jury to conclude that 37 feet could constitute the requisite distance.  Here, the instruction defining the natural and probable consequences theory contained specific language to prevent the jury from convicting appellants under that theory without making the requisite finding that "*a co-participant in* [the] conspiracy to commit battery *committed the crime of murder or attempted murder.*"  (Italics added.)  The court also instructed the jury that it "must follow the law as [explained to it by the court and that if it] believe[d] that the attorneys comments on the law conflict with [the court's] instructions, [it] must follow [the court's] instructions."  It further instructed the jury to "[p]ay careful attention to all of the instructions and consider them together."  (CALCRIM No. 200.)  There is no reasonable likelihood that the jury convicted all three appellants of murder or attempted murder under the natural and probable

20

consequences theory without first finding that at least one of them perpetrated the crimes under an independent theory. (See *People v. Yeoman, supra*, 31 Cal.4th at p. 139; *People v. Tate, supra*, 49 Cal.4th at p. 696.)

*Transferred Self Defense Instruction*

Lino contends that the court committed prejudicial error by failing to instruct the jury with a transferred self-defense instruction. Alvino and Salas join in this contention. More specifically, appellants argue that the court had a sua sponte duty to give the jury a transferred self-defense instruction so it would understand that if Lino "unintentionally" shot Octavio, while intentionally firing at Gonzalez in self defense, the killing was not a crime. We disagree.

A trial court in a criminal case has a duty, even in the absence of a request, to instruct on general principles of law closely and openly connected to the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 149, 154-155.) "The duty to instruct sua sponte is limited to those "'general principles which are necessary for the jury's understanding of the case.'" (*People v. Garvin* (2003) 110 Cal.App.4th 484, 488-489.) However, in the case of defenses, "'a sua sponte instructional duty arises "only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case."'" (*People v. Russell* (2006) 144 Cal.App.4th 1415, 1424.) In this context, substantial evidence means "evidence sufficient for a reasonable jury to find in favor of the defendant . . . ." (*People v. Salas* (2006) 37 Cal.4th 967, 982.)

The court gave the standard jury instructions regarding murder (CALCRIM No. 520), degrees of murder (CALCRIM No. 521); manslaughter (CALCRIM Nos. 570, 571); provocation (CALCRIM Nos. 522, 570) and self-defense and defense of another (CALCRIM Nos. 505, 571). Taken as a whole, the instructions informed the jury that if Lino did shoot Octavio while trying to defend himself from Gonzalez, it would not be a crime. Specifically, the court instructed the jury as follows with CALCRIM No. 571: "If you conclude the defendant acted in complete self-

21

defense or defense of another, his action was lawful, and you must find him not guilty of any crime." The court did not err by failing to instruct the jury, sua sponte, with a separate transferred self-defense instruction. (*People v. Matthews* (1979) 91 Cal.App.3d 1018, 1025.)

*Accomplice Instruction*

Alvino and Lino contend that the trial court committed reversible error by instructing the jury that his testimony required corroboration in order to prove any fact. They each claim that this instructional error interfered with the defense based on his testimony and violated his constitutional rights.[11] We disagree.

"When reviewing ambiguous instructions, we inquire whether the jury was 'reasonably likely' to have construed them in a manner that violated the defendant's rights." (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 214.)

Alvino and Lino acknowledge that the trial court was required to instruct the jury that a defendant's testimony against an accomplice requires corroboration. They suggest that the court erred by failing to modify the accomplice instruction to clarify that the "jury should not require corroboration or view with caution any portion of Alvino's testimony that was exculpatory." They further argue that the court made a related error when it instructed the jury as follows: "Except for the testimony of Alvino Hernandez, which required supporting evidence, the testimony of only one witness can prove any fact."

When read in isolation, the just-quoted instruction might suggest that the jury could not rely on Alvino's testimony, whether it was exculpatory or inculpatory. However, another instruction clarified that it was Alvino's *inculpatory* testimony which was subject to special scrutiny. Specifically, the primary accomplice testimony instruction, CALCRIM No. 334 repeatedly informed the jury that it must view accomplice testimony with caution when it was inculpatory. The court instructed the jury in relevant part as follows, with CALCRIM No. 334: "*Before you may consider the*

_____

[11] Salas's reliance on this instruction below precludes his joining in this issue on appeal.

22

*testimony of Alvino . . . as evidence against . . . Lino . . . and . . . Salas*, you must decide whether Alvino . . . was an accomplice to the crimes charged against . . . Lino . . . and . . . Salas. [¶] . . . [¶] If you decide that Alvino . . . was not an accomplice, then supporting evidence is not required, and you should evaluate his testimony as you would that of any other witness. *If you decide that Alvino . . . was an accomplice, then you may not convict . . . Lino . . . and . . . Salas based on his testimony alone. You may use the testimony of an accomplice to convict . . . Lino. . . and . . . Salas* only if, one, the accomplice's testimony is supported by other evidence . . . ; two, that supporting evidence is independent of the accomplice's testimony; and, three, that supporting evidence tends to connect [them] to the commission of the crime. [¶] . . . The supporting evidence must tend to connect . . . Lino . . . and . . . Salas to the commission of the crime. [¶] *Any testimony of an accomplice that tends to incriminate . . . Lino . . . and . . . Salas should be viewed with caution.*" (Italics added.)

We also reject appellant's contention that the accomplice instruction violated his federal constitutional rights. Federal courts have rejected a due process challenge to the giving of accomplice instructions where the accomplice testified as a defense witness. In *U.S. v. Tirouda* (9th Cir. 2005) 394 F.3d 683, the Ninth Circuit Court of Appeals held that a properly formulated accomplice instruction may be given "whether [an accomplice] testifies for the prosecution or the defense." (*Id*. at p. 687.) Also, informing the jury that an accomplice's testimony must be viewed with greater caution than other witnesses did not violate the defendant's federal constitutional due process rights. (*Id*. at pp. 687–688.) "An accomplice's testimony may be suspect, regardless of whether he testifies for the prosecution or the defense." (*Id*. at p. 687.)

*CALCRIM No. 3472 (Contrived Self-Defense Instruction)*

Lino, joined by Salas and Alvino, further argues that the trial court committed prejudicial error and violated their constitutional rights by instructing the jury with CALCRIM No. 3472. More specifically, they claim "that [Lino] was not the person who started the fight and no mutual combat had yet occurred," and there was no evidence that appellants provoked a quarrel as a pretext to use violence, or that they

23

entered "the courtyard intending to use a firearm." Continuing in that vein, they contend that the court's instructions allowed jurors to find appellants entered the courtyard to fistfight the victims, without any right of self defense, because they instigated the fistfight, and that even if Gonzalez first reached for a firearm, Lino and Alvino had no right to defend themselves. We disagree.

The trial court instructed the jury as follows with CALCRIM No. 3472: "A person does not have the right to self-defense if he . . . provokes a fight or quarrel with the intent to create an excuse to use force." The evidence supports the inference that appellants instigated the fistfight as a pretext for using a firearm. Salas told Octavio he wanted to set up a fistfight between a Colonia member and "Johnny" of DSK. He asked Alvino to provide "back up." Alvino took a TEC-9 and a Makarov when he and Alvino went to meet Salas. Alvino, Salas, and Lino gathered with other Colonia members in the alley for about 20 minutes before going to the Lopez building. Alvino gave the TEC 9 to Lino. He and Lino each wore a sweatshirt, and put a gun under it. Alvino testified that he thought Salas would fight a DSK member, with Alvino and Lino providing back up. However, Alvino and Lino walked in *front* of Salas as they walked toward the Lopez building, and Alvino did not know if Salas even entered the courtyard with them. Appellants also claim that "there is no evidence that Lino or Alvino knew that Gonzalez and Abraham would arm themselves." The record belies their claim. Alvino testified that he anticipated that DSK members would be armed.

The court did not err by instructing the jury with CALCRIM No. 3472. Even if the evidence had not supported the use of CALCRIM No. 3472, the associated error would be harmless under any standard of review. (CALCRIM No.200) The court also instructed the jury that some of the instructions might not apply under the facts of the case, and that the jury had to decide the facts, and follow the instructions that applied to the facts as it found them. If the evidence did not support CALCRIM No. 3472, the jury would simply have ignored it. (*People v. Cross* (2008) 45 Cal.4th 58, 67; *People v. Watson, supra*, 46 Cal.2d at p. 836; *Chapman v. California, supra*, 386 U.S. at p. 24.)

24

*Revival of Self Defense Instruction*

Lino, joined by Salas and Alvino, contends that the trial court committed reversible error and violated their federal constitutional rights by failing to instruct the jury sua sponte that "[a] defendant who provokes or aggresses with nonlethal violence and is met with lethal force regains the privilege of self defense." We disagree.

Appellants claim that the failure to instruct jurors that a defendant can regain the privilege of self defense where he is met with lethal force in response to provoking the victim with nonlethal violence was prejudicial. They assert that a reasonable juror could have found that the defendants entered the Lopez courtyard "to pursue the agreement to commit battery [but] were disqualified from asserting a self defense, as initiators and so they were guilty even if Gonzalez was the first to reach for a firearm." They further argue if the court had instructed the jurors that the "use of lethal force by the victim re-establishes a right of self-defense, the jury would have had to consider whether Gonzalez's act of reaching for a firearm was the sort of lethal force that re-established [appellants'] right of self defense."

Assuming without deciding that the trial court erred by failing to instruct the jury that a defendant could regain his right of self defense, the error was harmless under any standard of review. Using CALCRIM No. 505, the court instructed the jury that a defendant can act in lawful self-defense or defense of another if "[t]he defendant used no more force than was reasonably necessary to defend against that danger." It further instructed the jury that "[t]he defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing or attempted kill[ing] was not justified," and that "[a]defendant is not required to retreat. He is entitled to stand his ground and defend himself and if reasonably necessary, to pursue an assailant until the danger of death or great bodily injury has passed. This is so even if safety could have been achieved by retreating." (CALCRIM No. 505.)

"The trial court's instructions assumed that defendant had *not* lost [the right of self defense]." (*People v. Johnson* (2009) 180 Cal.App.4th 702, 711.) The

25

pivotal question for the jury, if they believed appellants acted in self defense (or imperfect self defense), was whether appellants exercised that right in a reasonable manner. We are convinced beyond a reasonable doubt that the jury would conclude appellants did not act in a reasonable manner. Appellants argued to the jury that Gonzalez reached for his gun and Octavio's body was blocking bullets intended for Gonzalez. However, Lino fired four bullets at Octavio from close range and inflicted the fatal wounds. Together, he and Alvino fired more than 20 rounds at armed and unarmed victims, and repeatedly pistol whipped and shot Abraham in the face as he lay helpless on the ground. The trial court instructed the jury to determine whether the appellants acted in reasonable self-defense, just as it would have done if the jury had decided that appellants had regained the right to defend themselves. It was thus unnecessary for the court to instruct them that appellants could regain the right of self defense where the victims used excessive force. (See *People v. Johnson*, *supra*, 180 Cal.App.4th at p. 711 [Where court instructed jury with CALCRIM Nos. 3472 and 505, it was unnecessary to instruct with CALCRIM No. 3471.)[12] For the same reasons, the court properly would have refused a request by defense counsel to give such an instruction. We therefore reject appellants' contention that trial counsel's failure to request the instruction constituted the ineffective assistance of counsel.

*Substantial Evidence Supports Salas's Convictions*

Salas contends that there is not sufficient evidence to support his second degree murder and his attempted murder convictions under the natural and probable consequences theory. We disagree. Salas bases this contention upon a premise that we rejected in considering appellants' attack on the natural and probable consequences jury

---

[12] An optional paragraph of CALCRIM No. 3471 (for cases of mutual combat) embodies the excessive force/recovery of self defense concept described in this claim, in the following language: "However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting." (CALCRIM No. 3471, element 3 (Rev. April 2011.)

instruction, i.e., there was not sufficient evidence murder would be the natural and probable consequence of the intended battery.

*Sentencing*

Alvino contends that the trial court cited improper factors to justify its imposition of consecutive sentences for the three attempted murders. We disagree. Alvino forfeited these claims by failing to raise them below. (*People v. Scott* (1994) 9 Cal.4th 331, 353, 356.) Waiver aside, it is not reasonably probable that appellant would obtain a more favorable sentence if the mater were remanded. (*People v. Champion* (1995) 9 Cal.4th 879, 934, overruled on other grounds in *People v. Combs* (2004) 34 Cal.4th 821, 860 [upholding admission of gang evidence].)

In sentencing Alvino, the trial court imposed a 9-year upper term for the count 6 attempted murder, with consecutive middle terms of 2 years 4 months for each of the count 7 and 8 attempted murders. The court cited the same justification in each case: the crimes were independent and involved separate acts of violence. It also cited additional factors as justifying a high-term sentence. Alvino contends that the factors cited by the court were improper because he did not "personally" commit multiple acts of violence. Even if that premise were valid, he actively aided and abetted Lino, and supplied the weapon and ammunition he used to fire more than 20 rounds at the victims. Alvino also challenges the consecutive sentences for all three crimes because, he claims, they were committed with the same intent and objective. That fact, if true, is not controlling. (*People v. Valenzuela* (1995) 40 Cal.App.4th 358, 366 [where a defendant's conduct results in multiple deaths, "[t]he trial court should have the discretion to make [the defendant] 'pay' for [multiple] deaths"].) Finally, he argues that the court made improper dual use of the fact that he used a gun. We disagree. The court did not cite gun use as an aggravating factor. Further, where a trial court cites an erroneous factor as supporting a sentencing choice, the error is harmless if a single valid factor in aggravation justifies the sentencing choice. (*People v. Osband* (1996) 13 Cal.4th 622, 730.) The multiple aggravating factors set forth in the California Rules of Court support the court's selection of consecutive terms for Alvino's crimes. For example, the crimes

27

disclosed a high degree of cruelty, viciousness or callousness (rule 4.421, subd. (a)(1)); Alvino engaged in violent conduct that indicates a serious danger to society (rule 4.421, subd. (b)(1); he had served a prior prison term (rule 4.421, subd. (b)(3); and he was on parole when he committed the crimes (rule 4.421, subd. (b)(4).)

DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

James P Cloninger, Judge

Superior Court County of Ventura

_____

Ralph H. Goldsen, under appointment by the Court of Appeal, for Defendant and Appellant Lino F. Hernandez.

Sylvia Whatley Beckham, under appointment by the Court of Appeal, for Defendant and Appellant Alvino Joe Hernandez.

Diane E. Berley, under appointment by the Court of Appeal, for Defendant and Appellant Alejandro Salas.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven E. Mercer, Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.