Filed 4/26/22  P. v. Corona CA5
(opinion on transfer from Supreme Court)

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ALONSO CORONA,<br><br>    Defendant and Appellant. | F075515<br><br>(Kern Super. Ct. No. BF161200C)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Sylvia W. Beckham, under appointment by the Court of Appeal, and Darren M. Richie for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez, Sarah J. Jacobs and Ian P. Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

In 2017, a jury convicted appellant and defendant Alonso Corona of first degree premeditated murder for the shooting death of Victor Anaya (Pen. Code, § 187, subd. (a);[1] count 1). The jury also convicted defendant of attempted premeditated murder involving another victim, David Anaya,[2] stemming from the same incident (§§ 664, 187, subd. (a); count 2). The jury found true that defendant committed these crimes to benefit a criminal street gang (§ 186.22, subd. (b)(1)), and that, during these offenses, at least one principal intentionally and personally discharged and personally used a firearm that proximately caused great bodily injury or death (§ 12022.53, subds. (d), (e)(1)). The jury, however, did not find true that defendant personally inflicted great bodily injury upon David during the attempted murder.

Stemming from the same incident as counts 1 and 2, the jury convicted defendant of shooting at an inhabited dwelling (§ 246; count 3) and conspiracy to commit a crime (§ 182, subd. (a)(1); count 4). In these counts, the jury also found true gang enhancements (§ 186.22, subd. (b)(1)). In count 3 (shooting at an inhabited dwelling), the jury determined that at least one principal intentionally and personally discharged a firearm (§ 12022.53, subds. (c), (e)(1)). In count 4 (conspiracy), the jury determined that defendant used a firearm (§ 12022.5, subd. (a)). Defendant was sentenced to an aggregate prison term of 82 years to life.

In 2019, we issued an unpublished opinion in which we reversed the first degree murder conviction in count 1 because of prejudicial instructional error. We agreed with defendant it was possible the jury had improperly relied on the natural and probable consequences doctrine to find him guilty in count 1 as an aider and abettor. We could not declare the error harmless beyond a reasonable doubt. We modified the conviction in

---

[1] All future statutory references are to the Penal Code unless otherwise noted.
[2] Because Victor and David share the same last name, we will refer to them by their first names to avoid confusion.

2.

count 1 to second degree murder but gave the People the opportunity to retry the premeditation and deliberation allegation. In all other respects, we affirmed the judgment. (*People v. Corona* (Sept. 18, 2019, F075515).)

The California Supreme Court accepted review of this matter, and, on December 22, 2021, it directed us to vacate our prior opinion and reconsider the cause in light of Senate Bill No. 775 (Stats. 2021, ch. 551) (Senate Bill 775).

On February 1, 2022, we vacated our prior opinion and requested supplemental briefing from the parties. Via supplemental briefs, the parties agree that our prior disposition in count 1 is correct. Regarding the attempted premeditated murder conviction in count 2, we agree with defendant that it must be reversed in light of Senate Bill 775. An accomplice may no longer be convicted of attempted murder based on the natural and probable consequences doctrine. (*People v. Sanchez* (2022) 75 Cal.App.5th 191, 196.) In light of the instructional error that occurred in this matter, we cannot declare beyond a reasonable doubt that the jury convicted defendant in count 2 based on a legally valid theory.

We again reverse the first degree murder conviction in count 1, but modify it to second degree murder. We reverse the attempted premeditated murder conviction in count 2. The People shall have the opportunity to retry the premeditation and deliberation allegation in count 1, and the attempted murder charge in count 2. In all other respects, we affirm the judgment.

## BACKGROUND

We summarize the material trial facts. We provide additional facts later in this opinion when relevant to specific issues raised on appeal.

### I.    The Shootings at the House Party

The events in question transpired at a house party in Kern County. Upwards of 75 to 100 people attended the party throughout the night and into the early morning hours of August 15, 2015. Defendant was a gang member when these events occurred. He

belonged to a gang known as CSB, which stood for either Can't Stop Banging or Can't Stop Balling.

The prosecution established that defendant attended the house party. In addition to eyewitness testimony confirming defendant's presence, defendant's DNA was located on an empty beer bottle recovered at that house after these events. Defendant arrived at the party around midnight with about 10 other CSB members. The group had not been invited to the party, but someone had received a text message about it. That night, defendant wore a white T-shirt and a blue "L.A." hat.

Jose Montoya attended the party with defendant. Montoya was the younger brother of defendant's girlfriend. Defendant referred to Montoya as his brother-in-law.

The trial evidence established that defendant was armed when he attended this party. A CSB gang member, Collin Alvarado, testified that he saw both defendant and Montoya each with handguns in the evening before this party started. Other witnesses saw defendant at the party in possession of a gun.

As the party began to wind down in the early morning hours, the CSB members were asked to leave. The situation became tense. Some of the CSB members appeared upset and they did not readily agree to leave. Eventually, the CSB group moved to the front yard.

In the front yard, more words were exchanged between the CSB group and the males escorting them out of the house. There were about 15 males all together. A CSB member said, "We're not going to leave until this gets resolved." Victor, the murder victim, initially tried to calm down the situation. A CSB member was heard saying, "You think we're not going to do anything?" A member in the CSB group also said something like "I'm going to show you what I'm going to do." Defendant was present in the front yard when these exchanges occurred. As the situation became tense, a CSB gang member said, "We are just going to f[**]k these fools up." Defendant appeared mad. He said things like, "I don't give a f[**]k if this is your house." A fellow gang

4.

member told defendant something like, "[W]hatever you want to do, I'm with you." A fist fight ensued. During the fight, multiple witnesses heard two separate volleys of shots. The first volley involved two shots. The second volley occurred about a minute later, and it involved anywhere from three to five shots. The witnesses described two shooters, one wearing a white shirt and blue hat. The second shooter wore dark clothing. The shots originated from the CSB group.[3]

At trial, the prosecution established that defendant fired the first volley of two shots. David, the victim of the attempted murder, testified that he saw defendant draw a black handgun, point it at Victor, and fire two shots. David ran at defendant and began wrestling him for the gun. They ended up wrestling on the hood of a car. While they struggled, defendant slid his weapon across the hood to another person. David eventually broke free and ran towards the house. David reached the front door and, as he opened it, he heard multiple shots. He was struck once in his mid-back. David woke in the hospital. While hospitalized, he spoke with detectives. He identified defendant in a photographic lineup as the person who fired two shots at Victor. David was 70 percent certain of his selection when he made it. At trial, David identified defendant as the suspect who shot twice at Victor. He said that Victor's shooter had worn a white shirt and a blue hat.

Another witness, J.L., saw a CSB member push Victor, who pushed back. The CSB member drew a firearm from his waistband, and Victor began struggling with this person over the firearm. J.L. heard two shots, but he did not see who fired those shots. After these events, J.L. selected defendant's photograph as the person he saw draw a firearm and struggle with Victor. At the time he made this selection, J.L. was 75 percent certain. At trial, however, J.L. said he did not recognize defendant in court.

---

[3] Neither Victor nor David, the two shooting victims, were armed when these events occurred.

5.

A fellow gang member, Alvarado, testified that he was involved in the fight. During the brawl, he heard two shots fired. He then saw defendant running away with a "pistol."

## II. Law Enforcement's Investigation

Police officers were dispatched to the house party at about 2:12 a.m. on August 15, 2015. Victor suffered two gunshot wounds. One shot went through his torso but did not pierce any vital organs. The other bullet pierced an artery, which caused death within minutes due to internal hemorrhaging.

David underwent surgery and he was hospitalized for multiple weeks. At the time of his trial testimony, he was still disabled.

Fresh bullet strikes were found on vehicles parked in front of the residence. Bullet strikes were also seen near the residence's front door, and on its wall. At trial, a police sergeant opined that the multiple shots had been fired from "two different positions." Police recovered two 9-millimeter shell casings in the front yard. Later testing confirmed that the two 9-millimeter casings had been fired from the same weapon. In addition, fragments of a projectile were recovered from Victor's body during his autopsy. Testing suggested that the projectile removed from Victor's body came from a .38- or a .357- caliber firearm.

During its investigation, police learned from a source that defendant and Montoya had been responsible for this shooting. This information had originated from defendant's brother. About four days after this shooting, an arrest warrant was issued for Montoya for the charge of first degree murder.[4]

## III. The Defense Evidence

Defendant's mother and his girlfriend (the mother of his child) testified on his behalf. They collectively asserted that defendant was home with them on the night in

[4] Montoya was not a party in this prosecution.

question.  Defendant's birthday was August 14, and they had stayed home to celebrate. The following day, defendant was home in the morning, but he then disappeared.

The parties stipulated that defendant's fingerprints were not located at the shooting scene.

## DISCUSSION

**I.     The Conspiracy Charge in Count 4 was Based on a Valid Legal Theory**

In count 4, defendant was convicted of conspiracy to commit a crime in violation of section 182, subdivision (a)(1).  The prosecution asserted that defendant had conspired to violate section 407.  Under this statute, "[w]henever two or more persons assemble together to do an unlawful act, or do a lawful act in a violent, boisterous, or tumultuous manner, such assembly is an unlawful assembly."  (§ 407.)

Defendant argues that his conspiracy conviction in count 4 could be based on a theory that he conspired to commit a lawful act in a violent manner (i.e., the second prong of § 407).  He contends that this second prong cannot serve as a valid basis for conspiracy because a person cannot conspire to commit a lawful act.  He further maintains that a lawful assembly could turn violent (i.e., unlawful) due to reasons beyond the conspirators' control or intent.  He asserts that it is impossible to know how the jury determined guilt for conspiracy, and he insists that reversal of this conviction is required. These arguments are meritless.[5]

Conspiracy is defined as two or more people agreeing to commit any crime coupled with proof of the commission of an overt act by one or more of the parties to that agreement.  (*People v. Swain* (1996) 12 Cal.4th 593, 600.)  Conspiracy is a specific intent crime.  (*Ibid.*)  To sustain a conviction for conspiracy to commit a particular offense, a prosecutor must establish that the conspirators intended to agree, but also that they intended to commit the elements of the underlying offense.  (*Ibid.*)

---

[5] In his reply brief, defendant makes it clear that this claim is not based on insufficiency of the evidence in support of his conspiracy conviction.

Relatively few published opinions discuss the crime of unlawful assembly. The intent for an unlawful assembly may occur either before or at the time of assembling, or it may be formed after the assembling has commenced. (*People v. Kerrick* (1927) 86 Cal.App. 542, 551.) The crime of unlawful assembly "pertains to the assembly at large. [Citation.] Not every member of the assembly must individually commit unlawful acts to render the assembly unlawful. [Citations.] If a person is a participant in a lawful assembly which becomes unlawful, he has an immediate duty upon learning of the unlawful conduct to disassociate himself from the group." (*In re Wagner* (1981) 119 Cal.App.3d 90, 103.)

Defendant cites no authority, and we have not found any, holding that persons cannot conspire to violate the second prong of section 407. In any event, we conclude that such a conviction is proper. Based on a plain reading of the statute, it is clear that multiple persons could agree to assemble to do a lawful act in a violent manner. Indeed, two or more people could agree to assemble at a political rally, a sporting event or a party, and intend to commit violence during that assembly. Moreover, persons could assemble peaceably and, after the assembly has started, they could agree to use violence. Once violence occurs, an unlawful assembly has resulted. If a member of the conspiracy commits an overt act in furtherance of the agreement to commit violence, a prosecutor could legally establish a conspiracy to violate section 407.

We reject defendant's claim that criminal liability under the second prong of section 407 is "redundant" to the first prong. Assembling to do an unlawful act (the first prong) clearly encompasses conduct not contemplated in the language of the second prong (assembling to do a lawful act in a violent manner). For instance, a group of protestors could, without relying on violence, occupy a government building and shut down its operations. Under the first prong of section 407, that assembly could be deemed unlawful and those knowingly participating could face criminal liability. On the other hand, the same protesters could participate at an otherwise lawful political rally which

grew violent. Those protestors who knowingly took part in the violent assembly could face criminal liability under the second prong of section 407. (See *In re Brown* (1973) 9 Cal.3d 612, 623 [holding that the prohibition under section 407 to do a lawful act "must be limited to assemblies which are violent or which pose a clear and present danger of imminent violence"].) In any event, the words of section 407 are clear and unambiguous so we will apply their common meaning. (*Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 640; *Burden v. Snowden* (1992) 2 Cal.4th 556, 562.) The plain statutory language belies defendant's suggestion that criminal liability cannot occur from the second prong, or that two or more persons could not agree to violate it.

The jury in this matter was told that defendant was charged in count 4 with conspiracy to commit unlawful assembly. With CALCRIM Nos. 415 and 417, the jury was instructed that the prosecution had to prove that defendant agreed with at least one other named person to unlawfully assemble, and defendant held an intent to unlawfully assemble. One member of the conspiracy had to have committed a defined overt act to accomplish the unlawful assembly. One possible overt act was defendant shooting and killing Victor. Another possible overt act was Montoya shooting and injuring David. The jury was told that a member of the conspiracy is criminally liable for any act done to further the conspiracy which was "a natural and probable consequence of the common plan or design of the conspiracy."

With CALCRIM No. 2685, the court informed the jury that the prosecution had to prove that defendant participated in an unlawful assembly. This was defined as "when two or more people assemble together to commit a crime or to do a lawful act in a violent manner. When two or more people assemble to do a lawful act in a violent manner, the assembly is not unlawful unless violence actually occurs or there is a clear and present danger that violence will occur immediately."

During closing argument, the prosecutor told the jurors that they had to decide defendant's intent when he brought a gun to the party and used it to aim and fire at

9.

Victor. The prosecutor explained that the charge of conspiracy to unlawfully assemble was based on defendant's intent to provoke a fight in the front yard. Later, the prosecutor stated that unlawful assembly "is basically coming together to commit a crime or coming together to lawfully, [*sic*] but doing it in a violent manner." He also described it as coming "together to commit a crime or to come together to commit an unlawful act in a moderate way."**6**

The prosecutor asserted that the evidence clearly established "a conspiracy to unlawfully assemble in the front yard." He argued that an unlawful assembly occurred when defendant fired his firearm at Victor in the front yard. According to the prosecutor, because of the unlawful assembly, defendant was liable for second degree murder under a natural and probable consequences theory even if it was Montoya who fired the fatal shot. However, if the jury determined that defendant acted with premeditation, and he was either a direct perpetrator or an aider and abettor, then defendant was guilty of first degree murder.

We reject defendant's claim that he merely agreed to assemble to engage in a lawful act. To the contrary, the evidence overwhelmingly suggested that defendant and the other CSB members assembled in the front yard to provoke a fight. Such conduct violated the first prong of section 407 (an assembly to do an unlawful act). After the assembly began, violence occurred. This violence was an overt act in furtherance of that

---

**6** Respondent impliedly concedes that the prosecutor misstated the elements of unlawful assembly. Respondent, however, argues that any misconduct was not preserved for appeal and was also harmless in light of the jury instructions given and the prosecutor's remaining closing argument. We need not address any suggested prosecutorial misconduct in this instance because, in his reply brief, defendant admits that he did not present this claim as one of prosecutorial error or misconduct. Instead, defendant contends that the prosecutor's misstatements are further evidence that his guilty verdict in count 4 was not based on a legally valid theory. We reject defendant's arguments. Based on the totality of the jury instructions and the prosecutor's arguments, defendant's conviction for conspiracy to commit unlawful assembly was based on a legally valid theory.

conspiracy. Thus, even if the evidence suggested that defendant initially assembled with others in a lawful fashion, he nevertheless violated the second prong of section 407. In either event, defendant could be properly convicted of conspiracy to violate section 407.

Based on this record, we reject defendant's arguments that his conspiracy conviction (count 4) was based on a legally invalid theory.[7] Under the circumstances of this case, it was legally possible for defendant to be guilty of conspiracy to unlawfully assemble, even under the second prong of section 407. Accordingly, defendant's arguments are without merit, and this claim fails.

## II. The Convictions in Counts 1 and 2 Must be Reversed but Reversal is not Required for the Conviction in Count 3

The parties agree, as do we, that instructional error occurred in count 1 (first degree premeditated murder), count 2 (attempted premeditated murder), and in count 3 (shooting at an inhabited dwelling). The instructional error involved CALCRIM No. 402 (the natural and probable consequences doctrine) and CALCRIM No. 417 (conspiracy). The trial court incorrectly inverted the target offense (the conspiracy charged in count 4) with the nontarget offenses (second degree murder, attempted murder, voluntary manslaughter, attempted voluntary manslaughter, or shooting at an inhabited dwelling).

In short, the court improperly instructed the jury that defendant was guilty of second degree murder, attempted murder, voluntary manslaughter, attempted voluntary manslaughter, or shooting at an inhabited dwelling if (1) he entered the conspiracy to

---

[7] Defendant claims that the prosecutor should have charged him with conspiracy to disturb the peace. He argues that such a charge would have avoided the "dual theories of liability" presented under the charge of conspiracy to unlawfully assemble under section 407. He maintains that, by charging both prongs of unlawful assembly as the target of the alleged conspiracy, the prosecutor "opened the door for a possible conviction for a non-criminal conspiracy." We need not respond to these arguments because we have already determined that the prosecution presented the jury with a legally valid theory of criminal liability. In any event, it was the prosecutor who had discretion regarding whom to charge and what charges to bring. (*People v. Birks* (1998) 19 Cal.4th 108, 134.)

11.

commit unlawful assembly, (2) a coconspirator committed unlawful assembly to further the conspiracy, and (3) those nontarget offenses listed above were a natural and probable consequence of the conspiracy. This same instructional error appeared in the written instructions provided to the jury during its deliberations.

The parties previously disputed whether or not this instructional error was prejudicial in counts 1, 2 and 3. We previously concluded that the first degree murder conviction in count 1 had to be reversed, and we modified it to second degree murder. We gave the People the opportunity to accept that reduction or retry the premeditation and deliberation allegation. (*People v. Corona, supra,* F075515.) However, we determined that reversal was not warranted for defendant's conviction for attempted murder in count 2, or for his conviction for shooting at an inhabited dwelling in count 3. (*Ibid.*)

In light of Senate Bill 775, we now agree that the attempted murder conviction in count 2 must also be reversed. However, we continue to hold that reversal is not warranted for the conviction in count 3.

### A.   *An improper legal theory was used to obtain the conviction in count 1 for first degree premeditated murder*

While defendant's appeal was pending, the Legislature substantially modified the law regarding accomplice liability for murder and attempted murder.

Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) eliminated the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder. (*People v. Gentile* (2020) 10 Cal.5th 830, 842–843.) Senate Bill 1437 also significantly narrowed the felony-murder exception to the malice requirement for murder. (See §§ 188, subd. (a)(3), 189, subd. (e); *People v. Lewis* (2021) 11 Cal.5th 952, 957.) Senate Bill 1437 created a procedure by which a person convicted of murder under the natural and probable consequences doctrine may file a petition with the sentencing court to have the conviction vacated. (Former § 1170.95, subd. (a).) Following Senate

12.

Bill 1437, the Courts of Appeal were split on whether it applied to attempted murder. Senate Bill 775, which became effective January 1, 2022, resolved that dispute.

Senate Bill 775 now permits a person convicted of murder or attempted murder under the natural and probable consequences doctrine to file a petition with the sentencing court to have the conviction vacated if certain conditions apply. (§ 1170.95, subd. (a)(1)–(3).) This amendment also permits a person convicted of murder or attempted murder to challenge the validity of those convictions on direct appeal if the convictions are not yet final.[8] (§ 1170.95, subd. (g).)

Before we filed our previous opinion in this matter, our high court previously held that, when an aider and abettor is liable for premeditated murder under the natural and probable consequences doctrine, the appropriate punishment is second degree murder. (*People v. Chiu* (2014) 59 Cal.4th 155, 166, superseded by statute as stated in *People v. Gentile, supra,* 10 Cal.5th at pp. 848–849.) However, the Supreme Court now holds that neither first nor second degree murder may be based on a natural and probable consequences theory. (*People v. Gentile,* at p. 846.) Malice for murder cannot be imputed to a person based solely on his or her participation in a crime. (§ 188, subd. (a)(3).)

Here, the trial court informed the jury that defendant was being prosecuted for first degree murder under three theories: (1) as a perpetrator; (2) under a theory of aiding and abetting; and (3) based on conspiracy.[9] In our prior opinion, we concluded that the trial court had improperly invited the jury to find defendant guilty of first degree murder if he was a member of a conspiracy to unlawfully assemble and a murder (or a lesser included

---

[8] The parties agree, as do we, that Senate Bill 775 retroactively applies in this matter because defendant's appeal is not yet final. (See *People v. Porter* (2022) 73 Cal.App.5th 644, 652; *People v. Montes* (2021) 71 Cal.App.5th 1001, 1006–1007.)

[9] In count 4, defendant was convicted of conspiracy to commit a crime in violation of section 182, subdivision (a)(1). The prosecution asserted that defendant had conspired to unlawfully assemble in violation of section 407.

13.

offense) occurred as a natural and probable consequence of that conspiracy. The jury was never informed it could not find defendant guilty of first degree murder based on the natural and probable consequences doctrine. The trial court cautioned the jurors that they could not find defendant guilty of first degree murder unless they all agreed that the prosecution had proven that defendant committed murder, but the jurors were told that they did not need to agree on the same theory of liability.

During closing argument, the prosecutor asserted that defendant could be guilty of murder based on multiple theories, including as a coconspirator under the natural and probable consequences doctrine. The prosecutor admitted to the jury that it was "not clear who fired the fatal shot." Victor was shot twice, and either defendant shot him twice, or Montoya shot him twice, or they each shot Victor once. The prosecutor asserted that defendant had an intent to kill because he brought a gun, and he was prepared to use it. Three witnesses testified that defendant pointed a gun at Victor. According to the prosecutor, the evidence supported all three theories of guilt in count 1. Either defendant was the direct perpetrator, or he aided and abetted, or defendant was "responsible for the natural and probable consequence of Victor's shooting." The prosecutor, however, informed the jury that defendant could only be guilty of second degree murder if he was guilty under the natural and probable consequences doctrine.

During deliberations, the jurors sent a written note to the trial court stating they were "unsure" about the legal definition of premeditation and how it "pertains to this case." The jury asked for a further definition. After conferring with the parties, the trial court directed the jury to review CALCRIM No. 521. The court stated that it was the jury's role to determine how to apply premeditation. The instruction under CALCRIM No. 521 informed the jury that defendant was being prosecuted for first degree murder under three theories, including "conspiracy."

A legally invalid theory was presented to the jury in count 1 to establish premeditated murder. (See *People v. Gentile, supra,* 10 Cal.5th at p. 846 [neither first

14.

nor second degree murder may be based on a natural and probable consequences theory.].) The instruction given under CALCRIM No. 521 demonstrates that one or more jurors may have found defendant guilty of first degree premeditated murder based on a theory he conspired to unlawfully assemble and he was vicariously liable under the natural and probable consequences doctrine.

When a trial court instructs a jury on multiple theories of guilt and one theory is legally incorrect, reversal is required unless the reviewing court can declare beyond a reasonable doubt that the jury based its verdict on a legally valid theory. (*People v. Chiu, supra,* 59 Cal.4th at p. 167; see also *People v. Guiton* (1993) 4 Cal.4th 1116, 1130, [jury instruction on an unsupported theory is prejudicial if it was the sole basis for a guilty verdict. If the jury based its verdict on a valid ground, or on both a valid and invalid ground, there would be no prejudice.].) The People bear the burden to establish that these instructional errors were harmless. (*People v. Smith* (1984) 35 Cal.3d 798, 808; *In re Loza* (2018) 27 Cal.App.5th 797, 805.)

In our prior opinion, we could not declare beyond a reasonable doubt that the jury based its guilty verdict in count 1 on a legally valid theory. (*People v. Corona, supra,* F075515.) We again reach the same conclusion.[10] The jury did not determine that defendant personally fired a weapon during Victor's murder. Instead, in count 1, the jury found true that "at least one *principal* intentionally and personally discharged and personally used" a firearm that proximately caused great bodily injury or death under section 12022.53, subdivisions (d) and (e)(1). (Italics added.) Moreover, in finding

---

[10] If the inadequacy of proof is purely factual, then reversal is not required if a valid ground for the verdict remains absent an affirmative indication in the record that the verdict was based on the inadequate ground. However, if the inadequacy is legal and not merely factual, reversal is required "absent a basis in the record to find that the verdict was actually based on a valid ground." (*People v. Guiton, supra*, 4 Cal.4th at p. 1129, fn. omitted.)

defendant guilty in count 1, the jury filled out general verdict forms, and it did not indicate the basis for finding premeditation and deliberation.

In our prior opinion, we reversed this conviction and modified it to second degree murder, but we gave the People the opportunity to accept that reduction or retry the premeditation and deliberation allegation. (*People v. Corona, supra,* F075515.) Following remand, both parties assert that our prior disposition in count 1 is still correct. We agree.

Based on the instructional error that occurred, we cannot declare beyond a reasonable doubt that the jury based the premeditation and deliberation allegation on a legally valid theory. It is very possible one or more jurors may have improperly found premeditation and deliberation from the natural and probable consequences doctrine. However, overwhelming evidence demonstrated defendant's malice in count 1. He went to the party with a loaded gun, and multiple witnesses identified him as Victor's initial attacker. No evidence suggested that Victor was armed, but multiple witnesses saw defendant draw his weapon and fire it twice at Victor. There was, however, a second shooter and it was unclear who fired the fatal shots.

Because the instructional error impacted only the degree of the crime, we will reduce the conviction to second degree murder. The People shall again have the opportunity to retry the premeditation and deliberation allegation.[11] (See *People v. Rivera* (2015) 234 Cal.App.4th 1350, 1359.) We remand for further proceedings.

### B. *An improper legal theory was used to obtain the conviction in count 2 for attempted murder*

The instructional error discussed above also requires reversal of the conviction in count 2. Since our prior opinion issued, attempted murder now cannot be based on the

---

[11] The double jeopardy guarantee imposes no limitation on the power to retry a defendant who has succeeded in having his conviction set aside on appeal on grounds other than insufficiency of evidence. (*People v. Hernandez* (2003) 30 Cal.4th 1, 6.)

natural and probable consequences doctrine. (*People v. Sanchez, supra,* 75 Cal.App.5th at p. 196; *People v. Montes, supra,* 71 Cal.App.5th at p. 1006.) Respondent concedes that defendant's jury was instructed on the natural and probable consequences doctrine in count 2 regarding the charge of attempted premeditated murder.

Based on this record, it is impossible to determine under what theory the jury convicted defendant in count 2. The prosecutor conceded to the jury during closing argument that the evidence did not show that defendant was David's shooter. The prosecutor repeatedly argued that, in part, defendant could be found guilty in count 2 under the natural and probable consequences doctrine. The prosecutor asserted it was reasonably foreseeable that defendant's actions in conspiring to unlawfully assemble could lead to somebody else shooting David, and defendant was guilty in count 2 even if he did not intend for the other shooter to fire at David. The jury found it "not true" that defendant had personally inflicted great bodily injury upon David in the commission of the attempted murder.

Respondent concedes that Senate Bill 775 applies to defendant's conviction in count 2. However, respondent argues that this matter should be remanded with directions for the trial court to determine whether defendant is entitled to relief under the amended law. We disagree.

Senate Bill 775 makes it abundantly clear that a person convicted of attempted murder may challenge the validity of that conviction on direct appeal if the conviction is not yet final. (§ 1170.95, subd. (g).) The parties agree, as do we, that defendant benefits from Senate Bill 775, and his conviction is not yet final. Consequently, this issue should be resolved on direct appeal.

In light of Senate Bill 775, defendant's conviction in count 2 must be reversed.[12] We cannot declare beyond a reasonable doubt that the jury did not rely on the now

[12] Because we are reversing counts 1 and 2, we need not address defendant's claim that reversal is also required in these counts based on alleged prosecutorial misconduct

invalid natural and probable consequences doctrine to find defendant guilty of attempted premeditated murder.  Consequently, we reverse defendant's sentence and remand for further proceedings.[13]  (See *People v. Sanchez, supra,* 75 Cal.App.5th at p. 197.)  The People may elect to retry the charge in count 2.[14]

### C. *Reversal of count 3 is not warranted*

In our prior opinion, we rejected defendant's claim that his conviction in count 3 was based on a legally invalid theory.  (*People v. Corona, supra,* F075515.)  Our prior conclusion has not changed.[15]

Shooting at an inhabited dwelling is a general intent crime under section 246. (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1123; *People v. White* (2014) 230 Cal.App.4th 305, 316.)  "A defendant may be liable for shooting at an inhabited dwelling as an aider and abettor."  (*People v. White, supra*, at p. 317.)  Apart from first degree premeditated murder, our high court has approved the use of the natural and probable consequences doctrine to establish the liability of a coconspirator.  Our Supreme Court recently noted that, while Senate Bill 1437 eliminated the natural and probable consequences doctrine's applicability to murder, it left that doctrine intact with respect to other crimes.  (*People v. Gentile, supra,* 10 Cal.5th at p. 849; see also *People v. Hardy* (1992) 2 Cal.4th 86, 188 [approving a jury instruction that a conspirator is

---

during closing argument.  In our prior opinion, we found that the claim of prosecutorial misconduct was forfeited.  (*People v. Corona, supra,* F075515.)  In light of the current disposition, that claim is now moot.

[13] Because the conviction in count 2 must be reversed, we decline defendant's invitation to remand this matter for resentencing on count 2 for the crime of assault with a firearm.

[14] The double jeopardy guarantee does not preclude a retrial in this situation.  (See *People v. Hernandez, supra,* 30 Cal.4th at p. 6.)

[15] In his supplemental brief following remand from the Supreme Court, defendant does not address or otherwise challenge our prior decision regarding count 3.

vicariously liable for the unintended acts by coconspirators in furtherance of the conspiracy or as the reasonable and natural consequence of the conspiracy].)

Unlike the convictions in counts 1 and 2, we can declare that the instructional error was harmless in count 3 beyond any reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24.) The evidence overwhelmingly established that either defendant and/or the second shooter (likely Montoya) fired at the inhabited dwelling. Either as a direct perpetrator, or as an aider and abettor, or because of the natural and probable consequences from the conspiracy to unlawfully assemble, the evidence conclusively demonstrated defendant's guilt in count 3. In other words, the guilty verdict rendered in count 3 was surely unattributable to the instructional error. (See *Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.) Accordingly, prejudice is not present, and reversal of the conviction in count 3 is not warranted.

### III. The Trial Court Shall Exercise its Sentencing Discretion Under Senate Bill No. 620 when Defendant is Resentenced

At the time of defendant's sentencing in this matter, the trial court was required to impose additional prison sentences for the firearm enhancements found true under sections 12022.5 and 12022.53. (Former §§ 12022.5, subd. (a), 12022.53, subd. (d).) On October 11, 2017, however, the Governor approved Senate Bill No. 620 (Stats. 2017, (Stats. 2017, ch. 682) (Senate Bill 620), which amended, in part, sections 12022.5 and 12022.53. Under the amendments, a trial court now has discretion to strike or dismiss these firearm enhancements. (§ 12022.5, subd. (c), § 12022.53, subd. (h).)

The parties agree, as do we, that these amendments apply retroactively to defendant because his case is not yet final. (*People v. Woods* (2018) 19 Cal.App.5th 1080, 1090, 228 Cal. Rptr. 3d 318.) The parties, however, previously disputed whether a remand was appropriate for the court to exercise this discretion. Respondent had asserted that a remand would serve no purpose. According to respondent, no reasonable court would exercise its discretion to strike defendant's firearm enhancements in light of his

19.

criminal conduct in this matter and the court's comments at sentencing. (See *People v. Gutierrez* (1996) 48 Cal.App.4th 1894, 1896.)

In our prior opinion, we had agreed with respondent that a remand would serve no purpose. During sentencing, the trial court expressed grave concern about defendant's criminal conduct in this matter. Moreover, in count 4, the court imposed the maximum firearm enhancement possible under section 12022.5, subdivision (a). We concluded that the court's sentencing choice established that it would not have struck or dismissed a firearm enhancement. As such, we previously determined it would be an idle act to remand this matter for the court to reconsider the firearm enhancements. (*People v. Corona, supra,* F075515.)

However, based on the recent changes in the law, defendant's sentence has been vacated, along with his convictions in counts 1 and 2. Consequently, because part of the sentence has been stricken on review, a full resentencing is appropriate so the trial court can exercise its sentencing discretion in light of the changed circumstances. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893.) We remand for further proceedings.

## **DISPOSITION**

Defendant's sentence is vacated, and this matter is remanded for further proceedings.

The conviction in count 1 for first degree murder is reversed with the following directions: If the People do not bring defendant to retrial within 60 days of filing the remittitur in the trial court pursuant to section 1382, subdivision (a)(2), or obtain a waiver of time by defendant, the trial court shall proceed as if the remittitur constituted a modification of the judgment to reflect a conviction of second degree murder in count 1 and resentence defendant accordingly.

The conviction in count 2 for attempted premeditated murder is reversed, but the People shall have the opportunity to retry defendant. If the People do not bring defendant to retrial within 60 days of filing the remittitur in the trial court pursuant to section 1382,

subdivision (a)(2), or obtain a waiver of time by defendant, the trial court shall resentence defendant accordingly.

In all other respects, defendant's judgment is affirmed.


POOCHIGIAN, J.

WE CONCUR:


LEVY, Acting P. J.


MEEHAN, J.